11-5364-cr
United States v. Hakimi

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: May 25, 2012                                    Decided: March 4, 2014)

Docket No. 11-5364-cr

UNITED STATES OF AMERICA,

*Appellant,*

— v.—

CHEYENNE ANDERSON,

*Defendant,*

ROOHID HAKIMI, aka Roehid Hakimi,

*Defendant-Appellee.*

BEFORE: HALL and CARNEY, *Circuit Judges*, and SCHEINDLIN, *District Judge.*[*]

Appeal from a judgment of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*), granting Defendant-Appellee Roohid Hakimi's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. We hold that the record contains sufficient evidence from which a rational fact-finder could find that the government proved the elements of the crimes charged, and in particular, that the totality of the evidence supports the

---

[*] The Honorable Shira A. Scheindlin, United States District Court Judge for the Southern District of New York, sitting by designation.

jury's inference of Hakimi's knowledge that the package he was poised to receive from a co-conspirator contained illegal drugs. REVERSED AND REMANDED.

Judge Hall dissents in a separate opinion.

> PAUL D. SILVER (Daniel C. Gardner, *on the brief*), *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, New York, *for Appellant*.
>
> MICHELE HAUSER, New York, New York, *for Defendant-Appellee*.

SUSAN L. CARNEY, *Circuit Judge*:

Following a three-day trial in the United States District Court for the Northern District of New York, a jury found Defendant-Appellee Roohid Hakimi guilty of conspiracy and attempt to possess and distribute controlled substances — primarily those known colloquially as "ecstasy" and "foxy methoxy."[1] Hakimi moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal, challenging the sufficiency of the evidence on which the jury's verdict rests. The district court (David N. Hurd, *Judge*) granted Hakimi's motion. United States v. Hakimi, 832 F. Supp. 2d 168 (N.D.N.Y. 2011). The government appeals.

Viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in support of the jury's verdict, as we must, we hold that a rational trier of fact could have found the elements of the charged crimes proven beyond a reasonable doubt. In particular, the jury was entitled to

---

[1] More particularly, the superseding indictment contained two counts with regard to Hakimi: Count 1, conspiracy to possess with the intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846, and Count 3, attempted possession with the intent to distribute a controlled substance, also in violation of 21 U.S.C. § 846.

infer Hakimi's knowledge that the highly valuable bag that he was poised to receive from a co-conspirator contained illegal drugs. The jury's guilty verdict must therefore be reinstated. We reverse the district court's judgment of acquittal, and remand for further proceedings consistent with this opinion.

## BACKGROUND

The evidence presented by the government at trial consisted chiefly of testimony from law enforcement agents and from one Cheyenne Anderson — a cooperating witness, who, like Hakimi, was charged with participating in the drug conspiracy. Evidence of calls and text messages placed to and from cellular phones belonging to Hakimi and Anderson was also introduced at trial. Viewed in the light most favorable to the government, the evidence demonstrated the following.

1.    <u>The drug trafficking organization</u>

From roughly 2008 through 2011, Cheyenne Anderson participated in a drug trafficking organization that smuggled ecstasy and other controlled substances from Canada into the United States, and cocaine from the United States into Canada. Anderson testified that, in her experience, the organization typically operated as follows: A member of the group would transport an ecstasy shipment from Montréal, Québec, to St. Regis Island in the St. Lawrence River. From there, the drugs would be ferried by boat to St. Regis (a Canadian town on the river's southern bank), or to another nearby location, where group members would transfer the drugs from the boat into a "load vehicle." Trial Tr. ("Tr.") 204. A courier would drive the load vehicle south to the shipment's destination, which, in one-half the

3

instances Anderson knew of, was New York City. Couriers transporting ecstasy to New York City sometimes picked up cocaine and cash there for transport back into Québec. The organization also smuggled aliens across the nearby border.

Anderson's most frequent role, which she filled on approximately nine occasions, was to act as a "blocker" or escort for a drug transporter. Tr. 201. In that capacity, her task was to drive at a distance in front of the courier who was actually transporting the shipment and alert the courier in advance to police locations and other potential problems on the way. On these occasions, an individual named Daisy Realza (who played a more important role in the group than Anderson) would call Anderson to alert her to the expected arrival of a drug shipment from Canada. Anderson, who lived on the St. Regis Mohawk Reservation near the St. Regis delivery point,[2] would then drive to meet the shipment. Once the drugs were transferred from the boat into the load vehicle, Anderson would begin driving the route. The load vehicle would leave St. Regis approximately thirty minutes after Anderson's departure. Anderson would block as far south as Saratoga Springs, a city about 180 miles south of St. Regis and 180 miles north of New York City, and then return home.

On two occasions, when the regular driver was "too messed up on drugs," Anderson herself drove the load vehicle to the New York City area. Tr. 208. At the start of those trips, Anderson took possession of the drugs in a single large bag that

_____

[2] The St. Regis Mohawk Reservation is also referred to as the Akwesasne Mohawk Reservation. It sits astride the United States-Canadian border, near Massena, New York.

4

held smaller bags containing pills. Anderson was told the pills were ecstasy, and she also visually identified the pills as ecstasy.

Within the trafficking organization, Anderson's main point of contact was Daisy Realza, mentioned above. Realza was also known to Anderson as "Verna" or "Perla." Both Realza and her boyfriend, Dallas George (Anderson's cousin), played lead roles in the organization. Anderson did not know how many other people were involved, or who those people were, but to her knowledge, the organization may have included "[w]hoever Perla [Realza] was friends with." Tr. 235. As Anderson attested to at trial, however, "[T]here had to be an element of trust involved . . . . And if you didn't trust a person or know the person personally, then you wouldn't want to give them twenty pounds of ecstasy . . . ." Tr. 235-36. Otherwise, Anderson agreed, that person could simply "drive off into the sunset" with the drugs, and the organization would be "out a lot of money." Tr. 236.

2. The events of April 16, 2011

On April 16, 2011, Realza contacted Anderson mid-afternoon, asking if she could help transport drugs that night. Because she did not have access to a vehicle, Anderson initially told Realza that she could not, but Anderson later decided to help, using her mother's Chevrolet Silverado truck for the job. That evening, having taken the truck, she drove to the river and picked up the incoming drug shipment, which was packaged in a large blue duffel bag.

After Anderson obtained the drugs and was joined by her seventeen-year-old nephew, whom she wished to accompany her, George directed her to "meet up with

5

this guy" at the Wal-Mart in Massena, New York, not far from St. Regis. Tr. 217.

Anderson understood that the man she was to meet at the store would be taking the drugs the rest of the way to New York City. George did not tell Anderson the man's name, but described him as "bald," and wearing "a blue sweater with white stripes." Tr. 218. That afternoon and evening, Anderson's communications with Realza and George were carried out by text messages and walkie-talkie.

Also on the afternoon of April 16, a border patrol agent saw a man later identified as Hakimi driving a Chevrolet Malibu westbound, heading away from the Reservation, on a state road near Massena. As investigators later learned, the Malibu had been rented by an "Angela Woods" days earlier at Detroit Metro Airport. The agent, who was in uniform and driving a marked car, testified that Hakimi "tensed up and grabbed the wheel" as the agent passed by. Tr. 33. When the agent pulled alongside, Hakimi "star[ed] straight ahead, [and] wouldn't make eye contact with [the agent]." Tr. 33, 34. After the agent began following the Malibu, Hakimi made an abrupt turn, without signaling, into a parking area. The agent perceived this turn to be an evasive maneuver.

Not long after darting into the first parking lot, Hakimi drove the Malibu across the street and parked in the lot outside of the Massena Wal-Mart. According to law enforcement testimony, the Wal-Mart lot was a common spot for drug and alien smuggling activities because of the cover given by the lot's high volume of traffic. The agent saw Hakimi leave his vehicle and enter the Wal-Mart.

6

Within about 15 minutes, near 5 p.m., a second border patrol agent arrived at the Wal-Mart to monitor Hakimi from an unmarked vehicle. Hakimi emerged from the Wal-Mart at around 6 p.m., walked to the Malibu, and placed a single shopping bag in the back seat. The agent observed that Hakimi had a shaved or possibly bald head, and that he was wearing a dark blue shirt with white stripes. After dropping off the shopping bag, Hakimi reentered the Wal-Mart. A third agent arrived at approximately 6:30 p.m. This agent, who was not in uniform, entered the Wal-Mart to observe Hakimi. He saw Hakimi seated in a fast-food restaurant within the store, with only his cell phone on the table in front of him. Approximately two hours later, the agent reentered the Wal-Mart and saw Hakimi still seated in the same spot. The agent saw nothing to indicate that Hakimi had eaten or made any additional purchases.

Meanwhile, Anderson was on her way to the Wal-Mart. At about 8:20 p.m., she received a text from George that read, "We good[?]" Gov. Ex. 36. Because (as Anderson reported) George changed his phone number often, Anderson did not recognize the incoming number and responded by text, asking, "Who's this[?]" Id. George texted, "Me d," to which Anderson replied, "Yep good so far." Id. George then texted, "He[']s got it[?]" Id. Anderson understood George to be asking whether she had completed the delivery to the man waiting at the Wal-Mart. She responded, "No I'm on my way to [Wal-Mart] now." Tr. 154; Gov. Ex. 36. When she arrived at the Wal-Mart, Anderson parked in front of the store and walked inside. She did not see the man matching the description provided by George, but, as she

7

was preparing to leave, Hakimi whistled to her. Hakimi was wearing a blue and white sweater, and he was "kind of bald." Tr. 221. When Anderson pointed at Hakimi and said, "You," Hakimi nodded in response, and followed Anderson out of the store. Tr. 220.

Once in the parking lot, Anderson and Hakimi entered Anderson's truck. Anderson's nephew had moved to the back seat, and Hakimi sat in the passenger's seat; the large blue duffel bag holding twenty pounds of drugs lay on the floor in front of the passenger seat. Because the lot was crowded, Anderson decided she did not want to transfer the drugs there; she told Hakimi that she "didn't want to do it at Wal-[M]art," meaning she did not want him "to take the drugs" there. Tr. 221. Instead, she told him to follow her. Hakimi replied, "Okay," exited the truck, and got into his car. Tr. 222.

Anderson drove the Silverado out of the Wal-Mart parking lot and Hakimi followed in the rented Malibu. The two cars proceeded east for a short distance and then turned onto a dark and narrow side road, and continued about one-quarter mile to the road's endpoint. One agent described the side road as "almost an alleyway." Tr. 115.

At the dead end, Anderson turned her vehicle around and parked so that her driver's side window was next to Hakimi's. Both drivers "blacked out" their cars, as one agent put it, meaning they turned off their vehicle headlights. Tr. 102. Anderson exited her truck and leaned into the Malibu to speak with Hakimi.

8

Hakimi told her that he had an address programmed into his global positioning system ("GPS") device for his New York City destination — "[h]e knew where he was going"— but that he needed an address for his return trip to the reservation — "[h]e didn't know how to get back." Tr. 223. Anderson "grabbed" the device to input the additional information. Tr. 223.

Just then, one of the agents who had been following Hakimi drove towards the pair, turned on his emergency lights, and boxed in the two vehicles. As the agent stepped out of his vehicle, Anderson approached him and explained that she was "giving directions to a friend she had met in the Wal-Mart parking lot." Tr. 104. Hakimi interjected that he "was lost" and Anderson was "helping him find his way" to a local casino. Tr. 104. When asked how long he had been in the area, Hakimi responded, untruthfully, "only . . . for about an hour." Tr. 105.

The agent next used a trained dog, a member of a K-9 unit, to conduct a forensic "sniff test" of the vehicles. When the dog alerted to the presence of drugs in Anderson's truck, agents searched the truck and recovered the blue bag from the floor of the front passenger seat, which contained four smaller bags each holding numerous pills. Beneath the back passenger seat agents also found a Ziploc bag of pills.[3] The agents took Anderson and Hakimi into custody.

Subsequent laboratory analysis disclosed that the blue bag of drugs weighed approximately 20 pounds and contained over 30,000 pills. Each of the pills was

---

[3] Anderson later testified that her teenaged nephew had removed the Ziploc bag from the blue duffel bag in an attempt to steal drugs.

composed of some combination of ecstasy, foxy methoxy, and MDPV, all schedule I controlled substances.[4] An expert witness estimated that in New York City, the drugs' street value was as much as $900,000.

From the car Hakimi was driving, agents recovered a GPS device, a BlackBerry, and a Wal-Mart shopping bag containing a prepaid phone card and a receipt. The BlackBerry reflected six phone calls placed by Hakimi to Dallas George during the six days leading up to the arrests, the two most recent calls having been made on the afternoon of April 15 and on the morning of April 16. Hakimi had also completed thirteen calls to a person with a number listed under the contact name "Chama," and fifteen outgoing calls to a contact listed as "Chamaaa." Both phone numbers began with a Québec area code. As Anderson later learned from Hakimi during a conversation connected with their court appearances, "Chamma" was the name by which the defendant referred to Realza.[5]

### 3. Procedural history

On September 7, 2011, the government filed a three-count superseding indictment against Hakimi and Anderson. Count One charged both defendants with conspiracy to possess with intent to distribute and to distribute a controlled

---

[4] The laboratory report identified pills composed of some combination of 3,4 methylene-dioxymethamphetamine ("MDMA" or "ecstasy"), 5-Methoxy-N,N-Diisopropyl-Tryptamine ("foxy methoxy"), and 3,4 methylene-pyrovalerone ("MDPV"). J.A. 15; Tr. 297-98, 304. For convenience, we refer to the entire shipment at issue here as "ecstasy."

[5] Anderson testified that after a court appearance, she asked Hakimi whether he had "heard or called either Dallas or Perla." Tr. 225-26. Hakimi initially said that he did not know who "Perla" was, but once Anderson described her, he acknowledged that he knew her as "Chamma."

substance. Count Two charged Anderson with possession with intent to distribute ecstasy, and Count Three charged Hakimi with attempt to do the same. Anderson soon pleaded guilty to both counts with which she was charged, and became a key witness for the government against Hakimi.

Hakimi's jury trial took place from December 13-15, 2011. At the close of the government's case, Hakimi moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), and the district court reserved decision. Hakimi elected not to offer evidence in his defense, and the case then went to the jury. After brief deliberation, the jury found Hakimi guilty as charged on both counts. The following week, the district court granted Hakimi's motion for judgment of acquittal and dismissed the charges. United States v. Hakimi, 832 F. Supp. 2d 168 (N.D.N.Y. 2011).

In its written memorandum, the district court reasoned that although the government had presented sufficient evidence to prove the existence of a drug trafficking conspiracy, and although Hakimi's behavior was "admittedly indicative of illegal activity," the government had not adduced sufficient evidence from which a reasonable jury could infer Hakimi's "knowledge and intent to participate in that conspiracy." Id. at 173. In the district court's view, "[e]ven accepting Anderson's testimony as true," no reasonable juror could conclude that Hakimi "knew Anderson had a bag of drugs in her truck or that he intended to take the drugs" from her. Id. Rather, "Hakimi's presence at the scene [could] be attributed to innocent circumstances; to wit, his intention to be smuggled across the border into

11

Canada"—the alternative explanation Hakimi's counsel had offered for the defendant's observed interactions with Anderson.[6] Id. The district court further discounted the import of the phone traffic between Hakimi on the one hand, and George and Realza, on the other, reasoning that because the final phone call between Hakimi and George occurred hours *before* Realza had contacted Anderson to ask for her help transporting the April 16 drug shipment, "[a] reasonable juror could . . . draw no inference about the defendant's knowledge of any plans to distribute these drugs from the phone calls." Id. Primarily for these reasons, according to the court, the government had failed to make its case and the jury verdict could not stand. See id. at 174.

The government filed its notice of appeal the day after the court entered the judgment of acquittal.

## DISCUSSION

On appeal, the government argues that the jury verdict should be reinstated, and that the district court erred in granting Hakimi's motion for an acquittal. It maintains that, on the evidence presented, a rational jury could find — as Hakimi's jury found — that Hakimi intended to take custody of the contraband in Anderson's car; that he knew the contraband was illegal drugs; and that he intended to deliver the drugs to persons in New York City pursuant to an illegal conspiracy, the aims of which he was aware of and intended to further. The government contends that the

---

[6] Hakimi told law enforcement officers that he was a Canadian citizen. When Hakimi was apprehended, Border Patrol had no record of Hakimi crossing legally into the United States.

12

jury acted rationally when it rejected the defense theory that Hakimi was "just trying to cross the border." Def. Br. 15. For the reasons discussed below, we agree.

### 1. Standard of review

We review the sufficiency of the evidence *de novo*. United States v. Heras, 609 F.3d 101, 105 (2d Cir. 2010). A defendant seeking to overturn a jury verdict on sufficiency grounds bears a "heavy burden," United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009), as we exercise an "exceedingly deferential standard of review," United States v. Hassan, 578 F.3d 108, 126 (2d Cir. 2008). We must "uphold the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Aguilar, 585 F.3d at 656 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

When assessing a sufficiency challenge, we are mindful that we consider the evidence presented "in its totality, not in isolation." United States v. Huezo, 546 F.3d 174, 178 (2d Cir. 2008). A Rule 29 motion "does not provide the trial court" — or, on review, the court of appeals — "with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted). Rather, we must view the evidence "in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011) (quoting United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008)). To sustain the jury's verdict, the government need not disprove "every possible

13

hypothesis" of the defendant's innocence.  United States v. Abelis, 146 F.3d 73, 80

(2d Cir. 1998) (internal quotation marks omitted).  And when there are "competing

inferences, we must defer to the jury's choice," because "it is the task of the jury, not

the court, to choose among competing inferences that can be drawn from the

evidence," Eppolito, 543 F.3d at 45 (internal quotation marks omitted).

At the same time, "specious inferences are not indulged." United States v.

Jones, 393 F.3d 107, 111 (2d Cir. 2004) (internal citations and quotation marks

omitted).  It "would not satisfy the Constitution to have a jury determine that the

defendant is *probably* guilty." United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir.

2008) (internal alterations and quotation marks omitted).  Thus, "if the evidence

viewed in the light most favorable to the prosecution gives equal or nearly equal

circumstantial support to a theory of guilt and a theory of innocence, then a

reasonable jury must necessarily entertain a reasonable doubt." Id. (internal

alterations and quotation marks omitted).

## 2. Conspiracy charge (Count One)

### A. Legal principles

#### i. Conspiracy generally

The law of conspiracy is well established within our Circuit.  To sustain a

conspiracy conviction, "the government must present some evidence from which it

can reasonably be inferred that the person charged with conspiracy knew of the

existence of the scheme alleged in the indictment and knowingly joined and

14

participated in it." Hassan, 578 F.3d at 123 (internal quotation marks omitted).[7]

The government may prove the defendant's knowing participation in a conspiracy through circumstantial evidence. Huezo, 546 F.3d at 180; United States v. Gordon, 987 F.2d 902, 906-07 (2d Cir. 1993). Circumstantial evidence probative of a conspiracy may include, for example, a defendant's association with conspirators "in furtherance of the conspiracy," United States v. Aleskerova, 300 F.3d 286, 292-93 (2d Cir. 2002); his presence at "critical stages of the conspiracy that cannot be explained by happenstance," id.; or his possession of items that are of essential significance to the conspiracy, id. In context, acts that exhibit "a consciousness of guilt, such as false exculpatory statements," Gordon, 987 F.2d at 907, may also tend to prove knowledge and intent of a conspiracy's purpose, although false exculpatory statements alone do not suffice to establish guilty knowledge, United States v. Reyes, 302 F.3d 48, 56 (2d Cir. 2002). Of particular import for the jury's verdict regarding Hakimi, "a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'" United States v. Florez, 447 F.3d 145, 155 (2d Cir. 2006) (quoting United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990)).

The government need not prove the defendant's familiarity with all of the conspiracy's details; it may demonstrate simply the defendant's awareness of the

---

[7] In drug conspiracy prosecutions under 21 U.S.C. § 846, no overt act in furtherance of the conspiracy need be proven. United States v. Shabani, 513 U.S. 10, 15 (1994).

15

"general nature and extent" of the conspiracy. Huezo, 546 F.3d at 180. It is not necessary to prove that the defendant expressly agreed with other conspirators on a course of action; "it is enough," rather, to show that "the parties ha[d] a tacit understanding to carry out the prohibited conduct." United States v. Nusraty, 867 F.2d 759, 763 (2d Cir. 1989) (internal quotation marks omitted). Indeed, a defendant may be a conspirator even if he knew only one other member of the group, and "a single act may be sufficient for an inference of [his] involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy." Huezo, 546 F.3d at 180 (internal quotation marks omitted).

We have often observed, however, that a defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy. United States v. Ogando, 547 F.3d 102, 107 (2d Cir. 2008); Lorenzo, 534 F.3d at 159-60.

ii.      Intent to commit the offenses that were the objects of the conspiracy

Critically, in order to prove conspiracy, the government must demonstrate that the defendant possessed "the specific intent to commit the offenses that were [its] objects." Huezo, 546 F.3d at 180 (internal quotation marks omitted). This requires the government to prove "at least the degree of criminal intent necessary for the substantive offense itself." United States v. Torres, 604 F.3d 58, 65 (2d Cir. 2010) (internal quotation marks omitted).

16

To prove the substantive offenses underlying the conspiracy charged in this case, the government must establish that the defendant agreed "knowingly or intentionally [to] . . . possess with intent to . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a)(1); see also Torres, 604 F.3d at 65-66. As to intentional possession and distribution of a controlled substance, the government must, of course, prove that the defendant "knew he was dealing with a controlled substance." Torres, 604 F.3d at 66. Therefore, to convict Hakimi of the conspiracy charged, the government was required to prove that Hakimi knew the conspiracy involved controlled substances, and that he participated in the conspiracy with the specific intent that controlled substances be possessed by him and distributed. See id. Circumstantial evidence may be used to prove specific intent to commit the object of a conspiracy, as it may to prove agreement to join the conspiracy. See Heras, 609 F.3d at 106 ("The law has long recognized that criminal intent may be proved by circumstantial evidence alone.").[8] It is a commonplace in drug conspiracy prosecutions that "most evidence of intent is circumstantial," and since "conspiracies are undertakings in secret[, they] often cannot be proven except through the use of circumstantial evidence." Id. (internal quotation marks omitted).

---

[8] Intent to distribute may be inferred from the volume of drugs with which defendant was associated or that was in his actual or constructive possession. United States v. Hamilton, 978 F.2d 783, 786 (2d Cir. 1992). No claim is made that the twenty pounds of ecstasy and foxy methoxy seized in connection with Hakimi and Anderson's arrest were intended for a purpose other than illegal distribution.

### B.    Analysis

Hakimi acknowledges (as did the district court) that the record evidence was sufficient for the jury to find that on April 16, 2011, Anderson, Realza, and Dallas George were part of a drug trafficking organization that was operating in the corridor along the Hudson River from the Canadian border to the New York City area.  See Hakimi, 832 F. Supp. 2d at 172.  The organization's nature and standard method of operation are undisputed on appeal.

The question presented for our consideration is whether the evidence supported the jury's determination that Hakimi knowingly joined the organization's conspiracy to possess and distribute a twenty-pound shipment of ecstasy.

We address that general question in two subparts.  We first ask whether the evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that, when Hakimi met with Anderson at the Wal-Mart parking lot, he intended to take possession of the blue duffel bag that Anderson was carrying in her truck and deliver it to points south, as opposed to achieving some other purpose.  We then consider whether the evidence was sufficient to conclude that Hakimi knew the bag contained contraband of some kind, and, if so, that Hakimi knew the contraband he was poised to take control of and deliver was illegal drugs.  As further explained below, if the answers to these questions are in the affirmative, we must sustain the jury's verdict as to the conspiracy charge; if not, we must affirm the district court's judgment of acquittal.

### i. Hakimi's intent when he met with Anderson

Anderson's testimony makes clear that she understood George to have directed her to transfer the blue bag to Hakimi, and that she planned and was poised to make this transfer when she and Hakimi were arrested. Anderson testified that, after she picked up the bag, George told her to "meet up with" a bald man in a blue-and-white-striped sweater who would be waiting for her at the Massena Wal-Mart. Tr. 217-218. When asked at trial why she did not take the bag to New York City herself, Anderson testified that George "had found somebody else" — i.e., Hakimi — "to do it." Tr. 218-19. She further testified that when she told Hakimi she did not want to "do it" in the Wal-Mart parking lot, she meant that she did not want Hakimi to "take the drugs" there, Tr. 221, and added that she had "no idea" as to whether Hakimi was supposed to be smuggled into Canada at some point, stating, "It wasn't my problem *after he took the drugs*." Tr. 260 (emphasis added).

Direct physical evidence recovered from Anderson's BlackBerry corroborates her testimony. At 8:22 p.m. on the night of the arrests, Anderson received a text from George asking, "We good[?]" and then, "He[']s got it[?]" Gov. Ex. 36. Anderson testified that she understood George to be asking whether she had delivered the drugs to Hakimi.

Hakimi's own conduct, as reported by Anderson and the law enforcement officers, further supports a finding that Hakimi intended to accept control over the blue bag and deliver it to New York City. At the Wal-Mart, Hakimi flagged

19

Anderson, and followed her to her truck. When she told him she did not want to "do it" in the Wal-Mart parking lot, he replied only, "Okay," Tr. 222, and trailed her out of the parking lot to the end of a dark road. Hakimi did not ask why it was necessary to leave the Wal-Mart parking lot in order to transact their business together, nor did he ask Anderson what she meant by "do it"; indeed, Hakimi said and did nothing that suggests ignorance of the purpose behind their meeting or surprise at her suggestion that they go to a dark alleyway to accomplish the goal of their meeting. See Gordon, 987 F.2d at 907 (giving weight regarding the defendant's intent to the observation that he "did not refuse to accept the drugs or profess any surprise or lack of understanding. Rather, . . .[he] 'said yes.'"). Furthermore, once parked at the dead end, Hakimi told Anderson he had an address programmed into his GPS for New York City — the destination of the blue bag — but that he needed an address on the reservation for his return trip.

The totality of the evidence cited above supports the inference that Hakimi, George, and Anderson were each and all aware that the purpose of Hakimi's meeting with Anderson at Wal-Mart was for Anderson to transfer goods to Hakimi for transport to and delivery in New York City, and that Hakimi sought to carry out his role within the conspiracy. Thus, Hakimi was more than "merely present" in the picture of a drug transaction that Anderson and the testifying officers drew; "all of the circumstances considered together show that by his presence he meant to advance the goals of [the drug] conspiracy." Abelis, 146 F.3d at 80 (internal quotation marks omitted).

20

Nevertheless, the district court found that the record gave "equal or nearly equal circumstantial support to a theory of innocence; to wit, the defendant went to the Walmart in order to meet up with someone sent by [George] who was to provide him directions to a location on the Reservation from which he could sneak back into Canada illegally." 832 F. Supp. 2d at 174. In support of this theory, the district court cited Anderson's testimony in which she acknowledged that the trafficking organization smuggled undocumented persons across the border (as well as drugs), and that the Wal-Mart parking lot "was a popular place to pick up undocumented persons." Id. at 173.

We respectfully disagree with this proposed interpretation of the evidence. First, the district court's theory would require us to disregard Anderson's testimony about her purpose and plans on April 16 — testimony that we must credit in a sufficiency challenge. See, e.g., Ogando, 547 F.3d at 107 (when reviewing a sufficiency challenge, "[t]his Court . . . resolve[s] all inferences from the evidence and issues of credibility in favor of the verdict" (internal quotation marks omitted)). As the district court implied,[9] Anderson's testimony may not have been flawless, 832 F. Supp. 2d at 174-75 n.1, but "[i]t is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the

_____

[9] While acknowledging that such credibility determinations were not appropriately part of a Rule 29 analysis, and stating that its observation "did not impact" its Rule 29(a) analysis, the district court nevertheless commented that the testimony of the Border Patrol agents was "significantly more credible than Anderson's," 832 F. Supp. 2d at 174-75 n.1.

21

essentials of [her] testimony." United States v. Truman, 688 F.3d 129, 140 (2d Cir. 2012) (internal quotation marks omitted); see also Florez, 447 F.3d at 156 ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge."); United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir. 1992) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and we are not entitled to second-guess the jury's assessments.").

Even were we to accept for the sake of argument that Anderson was mistaken or dissembling as to the mission George assigned her that afternoon, the district court's theory of innocence would still be inconsistent with the record evidence. If, for example, Hakimi thought that he was at the Wal-Mart only to receive directions to a place from which he could "sneak back" into Canada, it makes little sense that he and Anderson would need to leave the parking lot to "do it," and it is hard to imagine why he and Anderson would need to douse their headlights when meeting at the end of the cul-de-sac. Also, one must wonder why George would divert Anderson, who was carrying hundreds of thousands of dollars' worth of illegal drugs, from the delivery trip to complete this simple task — one that conceivably could have been handled over the phone. In short, we are simply not persuaded by the district court's assessment that the evidence provides "equal or nearly equal circumstantial support" for the speculative theory that Hakimi sought only to be smuggled north across the border when he met with Anderson. Hakimi, 832 F. Supp. 2d at 174. Rather, we conclude that the jury acted rationally

22

when it inferred from all the circumstances, and from Anderson's testimony, that when Hakimi met with Anderson, he intended to take possession of the blue bag and deliver it to persons in the New York City area.

In support of his position that the evidence did not support his conviction, Hakimi relies heavily on our decision in United States v. Nusraty, 867 F.2d 759 (2d Cir. 1989). He argues that Anderson's "belie[f] [that] she was supposed to deliver the drugs to the person whom she met at the Wal-Mart is not sufficient to prove that Hakimi had conspired to receive them," Def. Br. 25, and that the additional evidence adduced does not support the conviction. We are unpersuaded. In Nusraty, we reversed for insufficient evidentiary support the drug conspiracy conviction of a taxi driver who was arrested in connection with a "controlled delivery" of drugs by a passenger at JFK Airport. The passenger arrived in the United States from travels in India, and was apprehended at Customs in possession of a suit of clothing in which packets of heroin had been secreted. The passenger advised law enforcement officers that he was unaware of the hidden heroin, and that when in India he had been directed by the cab driver's brother (who gave him the suit for transport) to deliver the suit to Nusraty upon arrival. The passenger gave Nusraty's name and physical description, and, scanning the airport arrival area, the agents identified Nusraty, who had parked his cab and entered the airport.

But the "controlled delivery" did not occur: the passenger did most of the talking, and Nusraty denied to the passenger that he was expecting a delivery of any suit; denied other aspects of the transaction that his brother had purportedly described to the apprehended passenger; and declined either to accept the suit or to give the passenger a ride. When arrested, "Nusraty claimed that . . . it was purely a coincidence that he was in the airport when [the passenger] emerged from Customs." 867 F.2d at 761. The passenger himself was acquitted of conspiracy. Id. at 762.

On review of Nusraty's conviction, we held the evidence insufficient to support the jury's verdict, characterizing the government's case as establishing only Nusraty's "mere presence at the scene of an aborted drug transfer" and "mere association with those implicated in an unlawful undertaking." Id. at 764. "Simply waiting for someone at an airport," we said, was "not enough." Id. We contrasted the case against Nusraty with cases in which there was a pattern of acts, inculpatory conversations, or possession, either actual or constructive, of the illegal drugs. And we emphasized that Nusraty actively declined to accept the drug-laden suit that the passenger pressed on him, and otherwise behaved in ways seemingly inconsistent with the passenger's inculpatory account.

Our decision in Nusraty has served other livery drivers who had the bad fortune — coincidental or not — to pick up individuals involved in an illicit scheme and find themselves indicted for their trouble. See, e.g., Ogando, 547 F.3d 102, 104-

24

105 (livery cab driver and drug importation); United States v. Samaria, 239 F.3d 228, 232 (2d Cir. 2001) (unlicensed cab driver). But, unlike Nusraty, Hakimi was not a provider of public transportation; unlike Nusraty, he did not encounter the alleged courier in a public place, but rather followed the drug courier to a very private place (the cul-de-sac) appropriate for a secret transfer of illicit goods; unlike Nusraty, he was shown to have been in independent contact thirty-four times with two operators of the trafficking organization, including on the day of, and the day preceding, the planned delivery; and, unlike Nusraty, he did not express surprise at or rebuff his alleged co-conspirator's attempts to engage with him consistent with expectations of making a delivery. Cf. Gordon, 987 F.2d at 907 (distinguishing Nusraty); United States v. Oguns, 921 F.2d 442, 450 (2d Cir. 1990) (same). In sum, Nusraty does not require a different result here.

### ii.     Inferring Hakimi's knowledge that the bag contained illegal drugs

We next consider the evidence supporting Hakimi's awareness that the bag he was about to receive and transport contained contraband of some kind, and, if so, that the contraband was illegal drugs. We examine this requirement most closely because, of course, the purpose of the conspiracy and the heart of the charges against Hakimi lie in the contents of the blue bag: twenty pounds of ecstasy newly arrived from Canada.

On the day of his arrest, Hakimi was driving a vehicle that had been rented hundreds of miles away under another person's name. A uniformed law

25

enforcement agent observed that Hakimi "tensed up" and "grabbed the wheel" upon seeing the agent on the highway. Tr. 33. Hakimi then attempted what the agent understood to be an evasive maneuver. Once in the Wal-Mart, Hakimi spent four hours making only a single purchase and waiting with a cell phone on the table in front of him. He was monosyllabic when communicating with Anderson in public and in private, as reported by her. After following Anderson out of the parking lot and reaching the dead end, Hakimi turned off his headlights; his car was aligned driver door to driver door with Anderson's. When a law enforcement agent interrupted the transaction and questioned the pair, Hakimi lied to the agent, telling him that he had only been in the area for an hour or so.

From this behavior, the jury could infer Hakimi's knowledge that he was participating in an illicit activity. See Torres, 604 F.3d at 68-69 (holding that evidence was sufficient to permit inference that defendant knew packages contained contraband where his conduct was suspicious, his appearance was "nervous," and he made false exculpatory statement to investigators); United States v. Tran, 519 F.3d 98, 105 (2d Cir. 2008) (finding nervousness that "reflected consciousness of guilt rather than ordinary anxiety upon interacting with law-enforcement" supported jury's guilty verdict); Nusraty, 867 F.2d at 765 (explaining that defendant's "false exculpatory statement . . . offers evidence from which it could be inferred that the [defendant] . . . surmised he was implicated in some sort of criminal activity").

26

But this is not enough. The government was also required to show that Hakimi knew the illicit activity involved a controlled substance. See Torres, 604 F.3d at 66. The government's proof that Hakimi knew the blue bag contained drugs consisted of Anderson's testimony; testimony of three law enforcement officers regarding Hakimi's behavior and the circumstances of his arrest; and evidence regarding text messages sent contemporaneously with the transaction and phone calls made by Hakimi to principals in the drug conspiracy. In considering the significance of this evidence, we recall that intent is often established by circumstantial evidence. Heras, 609 F.3d at 106.

The jury's finding that Hakimi was aware of the nature of the contents of the bag and thus the conspiracy's objective rests primarily upon inferences drawn from the totality of the evidence. These inferences, which are of a type that our Court has previously and repeatedly endorsed, are as follows: First, drug dealers would be very unlikely to confide hundreds of thousands of dollars' worth of drugs to the sole control of a person who was not a trusted member of the conspiracy. Second, a trusted member of the conspiracy may reasonably be expected to have knowledge of the nature of the conspiracy, i.e., distributing illegal drugs.

As we discuss below, the jury could infer that Hakimi was a trusted member of the conspiracy, and accordingly that he knew of the contents of the bag that Anderson plausibly testified she was about to give him. These general inferences derive decisive strength in Hakimi's case from Anderson's testimony that the principals in *this conspiracy in particular* would not have committed a valuable

27

shipment of drugs to a person who was not a trusted individual. We turn now to examining more closely these critical components of the jury's verdict.

### a. The case law regarding the knowledge inference

In several instances, our Court has considered the inferences a jury is permitted to draw from evidence that a conspiracy entrusted a defendant with valuable contraband. For example, in United States v. Huezo, 546 F.3d 174 (2d Cir. 2008), we found the evidence offered at the defendant's trial for money-laundering and a related conspiracy charge sufficient to prove beyond a reasonable doubt the knowledge and intent elements of those crimes. The record included evidence that, shortly before the money laundering transactions were undertaken, Huezo had traveled cross-country with two co-conspirators. Then, when under surveillance, Huezo drove one of them and a suitcase containing $500,000, to make a delivery to a third (a supposed money launderer, but in reality an undercover agent); and two days later, Huezo drove the two co-conspirators and a second suitcase containing $500,000, making a second delivery to the undercover agent. Just before making the second delivery, Huezo took personal possession of another bag of money containing $6,000, packaged similarly to the $1 million that he and the others delivered in the two suitcases. During the period of these transactions, Huezo socialized, dined, and shopped with the two co-conspirators; the three occupied the same house, where the money was kept before delivery to the agent. Id. at 182.

Our Court rejected the defendant's argument that the government had failed to adduce evidence showing his knowledge of the contents of the suitcases. We held that Huezo's conduct and his relationship with his co-conspirators were sufficient to

28

support a reasonable inference that Huezo knew that the suitcases contained cash.

Id.  Pointing to the value of the delivery that Huezo was a part of, we explained:

> Based on the complexity and scale of the money laundering scheme, common sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds, to be present when [the undercover agent posing as a conspirator] removed the first suitcase containing $500,000 from the trunk, and to share a house over several days with witting conspirators.

Id.

Huezo is only one in a line of cases within this Circuit in which we have endorsed the application of such an inference.  In United States v. Abelis, 146 F.3d 73 (2d Cir. 1998), for example, the defendant claimed that the government had not provided sufficient evidence of the defendant's knowledge of the purposes of an extortion conspiracy.  Id. at 80.  Rejecting this claim, we emphasized that "the jury was entitled to place great weight on the fact that the other conspirators trusted [defendant] to safeguard [a] $3.5 million payment that was to be made into an offshore bank account to which [defendant] was the sole signatory."  Id. at 81.  Likewise, in United States v. Sisca, 503 F.2d 1337 (2d Cir. 1974), we rebuffed a sufficiency challenge to a drug conspiracy conviction in the face of a defendant's claims of ignorance, observing in relevant part, "[T]he suggestion that members of a conspiracy would entrust $60,000 in cash and a large quantity of narcotics to one who was not a full partner strains credulity."  Id. at 1343;  see also United States v. Ramirez, 320 Fed. App'x 7, 10 (2d Cir. 2009) (summary order) ("[C]ommon sense and experience would support an inference that the 'principals in [a large]

29

conspiracy would not have trusted an outsider [ ] with no knowledge of their

criminal purpose[] to transport' hundreds of thousands of dollars in cash and

drugs." (quoting Huezo, 546 F.3d at 182) (alterations in original)); cf. United States

v. Aleskerova, 300 F.3d 286, 293 (2d Cir. 2002) ("A defendant's knowing and willing

participation in a conspiracy may be inferred from . . . evidence that [he] possessed

items important to the conspiracy.").[10]

We recognize that there must be limits to the inferences upon which the

government may rely to establish a defendant's knowledge of the object of a

conspiracy. As we have noted, our opinions applying the knowledge inference of the

type we affirm here are heavily fact-specific, and typically permit drawing the

proposed inference in the context of numerous factors in addition to the value of the

goods in question. In some circumstances, therefore, our Court has acknowledged

that such an inference could be appropriate in principle, but then rejected its

application because of the inadequacy of the surrounding factors demonstrating

trust or expected sole dominion over the valuable goods.

---

[10] Our sister circuits have also held that a jury may reasonably infer a defendant's knowledge of the true nature of a high-value drug shipment he or she is assigned to transport, on the rationale that a drug enterprise would not entrust such a shipment to a dupe. For example, in United States v. Quilca-Carpio, the Eleventh Circuit held that the evidence at trial was sufficient for a reasonable jury to conclude that a person apprehended "with luggage containing a significant amount of drugs knew of the presence of the drugs." 118 F.3d 719, 722 (11th Cir. 1997). "A reasonable jury," the court concluded, "could infer from the quantity of drugs seized that a 'prudent smuggler' is not likely to entrust such valuable cargo to an innocent person without that person's knowledge." Id. at 722. Similarly, in United States v. Uriostegui-Estrada, the Seventh Circuit rejected a sufficiency claim in which the defendant argued that he did not know the suitcase he had agreed to transport on a stranger's behalf contained heroin. 86 F.3d 87, 89 (7th Cir. 1996). "The jury reasonably could believe that a drug smuggler would not entrust a cargo worth more than $1 million to a complete stranger who was unaware of its value," the Court explained. Id. And "[o]nce the jury concluded that [the defendant] had no plausible explanation for how he innocently came to possess $1 million worth of heroin, it was entitled to conclude that he knew he was carrying drugs." Id.

Thus, for example, while acknowledging in principle the inference's legitimacy, we held that the government's proof in support of the inference fell short in United States v. Torres, 604 F.3d 58 (2d Cir. 2010). There, our Court reversed a defendant's conviction for conspiracy to distribute and possess with intent to distribute cocaine on the grounds that the evidence was insufficient to prove beyond a reasonable doubt that Torres acted knowingly and with the specific intent to further the conspiracy. The government's case included evidence that ten kilograms of cocaine had been secreted in a shipment from Puerto Rico to New York; the shipment was addressed to Torres; Torres was at that address, with others, attempting to take possession of the shipment on the day in question; Torres attempted to convince a UPS driver to release the shipment to him; and Torres, again with others, went to a UPS Store to retrieve the shipment. Id. at 69.

We held that, while this evidence established the existence of a conspiracy and supported the inference that Torres intended to possess contraband, the government had not presented sufficient evidence to conclude that Torres knew the packages contained drugs. Id. at 70. We found the government's analogy to Huezo "inapt" because, in contrast to Huezo, the government had produced inadequate evidence of the nature of the relationship between Torres and the conspiracy's principals or of any expectation that Torres would, as part of the conspiracy, exercise *sole* dominion over the unidentified packages. Id. at 70-71. In this vein, the Court specifically noted that the shipment had not been sent to Torres "in a location that he controlled," and that Torres was accompanied by others each time

31

he attempted to take custody of the shipment. Id. at 71. Thus, we found that, at all relevant times, "Torres was never in a position to be alone with the [shipment]." Id. Therefore, the record did not "lend itself to an inference that Torres was so trusted that he must have known that he was dealing with narcotics." Id.

In United States v. Lorenzo, 534 F.3d 153 (2d Cir. 2008), we also declined to permit application of the knowledge inference endorsed in Huezo. In Lorenzo, the principal in a drug conspiracy had instructed a courier carrying a suitcase with $250,000 worth of drugs to make telephone contact with the defendant, who had been present at an earlier transaction and had delivered a package of cash to the courier on that occasion. Id. at 157, 161. During the incident that was the subject of the arrest, the courier attempted to call the defendant, but his wife answered the phone as he was asleep. She invited the courier to come to her home temporarily, which the courier did, bringing the suitcases containing drugs. Id. at 157. The defendant, now awake, was then arrested. The government argued on appeal that it could be inferred that the principal "would not have entrusted [the defendant] with the suitcases concealing the narcotics . . . unless [the defendant] had known what was concealed within them." Id. at 161. In the panel's view, however, the proposed inference, resting primarily on the "unfulfilled request for [the defendant]," was "speculative and attenuated," having been "severel[y] undermine[d]" by his wife's failure to awaken him when the courier attempted to establish contact with him. Id.

From these cases, we elicit two tenets relevant to our resolution of this aspect of Hakimi's case. First, the fact that conspirators intended to commit highly valuable contraband to the defendant's sole custody and control provides important evidence of a trust relationship between the defendant and other conspirators. Second, and relatedly, jurors may infer a defendant's knowledge of the object of a conspiracy — e.g., to possess and distribute drugs — where there is evidence of such a trust relationship. The reasonableness of these inferences is, however, highly fact-dependent, and must be determined on a case-by-case basis.[11]

b.     Application of the principles to the evidence against Hakimi

Applying these principles to the matter before us, we conclude that the jury could reasonably find that Hakimi enjoyed a trust position within the conspiracy such that one may infer his knowledge of the conspiracy's goal of distributing controlled substances. The record demonstrates that the principals of the conspiracy intended to commit a highly valuable drug shipment to Hakimi's sole custody. Indeed, the plan was that Hakimi would take control of the bag of drugs that evening, and Anderson came within moments of transferring to Hakimi 30,000 pills of ecstasy and foxy methoxy worth up to $900,000. Anderson testified that

---

[11] Our recent decision in United States v. Davis, 690 F.3d 127 (2d Cir. 2012), cert. denied, 133 S. Ct. 889 (2013), also emphasizes the fact-dependent nature of knowledge inference analysis. In Davis, we permitted the jury to infer the defendant's knowledge of the contents of a large package of drugs that it appeared he had shipped to himself under the guise of "[tire] rims." Id. at 129. When arrested, he had just taken constructive possession of the package by presenting a bill of lading and directing the package's deposit into an associate's vehicle. In Davis, we again endorsed a jury's reliance on the prospect that the defendant would have "sole dominion" over the package of narcotics as one factor of several that could tend to support a jury's inference of knowledge.

Hakimi had a New York City address in his GPS device and was prepared to drive there. No one else was traveling with Hakimi; the drugs would be his to do with as he wished.[12] This is strong evidence of Hakimi's trusted status in the conspiracy, and his knowledge of the contents of the bag, and thus, the conspiracy's purpose. See Huezo, 546 F.3d at 183; cf. Torres, 604 F.3d at 71.

There is, moreover, additional support in the record for finding that Hakimi was a knowing conspirator. The government produced evidence of extensive phone contacts between Hakimi and the conspiracy's principals. As previously noted, Hakimi's phone records revealed twenty-eight calls to Realza. Hakimi also placed six calls to George in the six days prior to April 16, including one call on the morning of the planned transfer. Clearly, Hakimi, Realza, and George were well-acquainted, and well-connected in the lead up to the crime.[13] It was hardly coincidental that Hakimi both appeared at the Wal-Mart, dressed as described by George, and acted according to the conspirators' shared plan.

_____

[12] We note also that the blue duffel bag gave ready access to an interested party, as illustrated by the successful pilfering accomplished by Anderson's nephew while he sat in the Silverado. Tr. 108, 224-25; see Gov. Exs. 6, 7. Unlike the sealed boxes delivered in Torres or the packages sewn into the erstwhile wedding suit in Nusraty, the packaging of the drugs that Hakimi planned to transport suggests that his co-conspirators trusted him to make the delivery, and that he knew the contents of the bag.

[13] Our dissenting colleague advises, "I am not persuaded that Hakimi's post-arrest statements to Anderson suggesting that he knew Perla [Realza], phone calls of an unknown nature between Perla and him, and his few contacts with the phone number attributed to Dallas George are sufficient, without more, to support an inference that he is a trusted member of the conspiracy." Dissenting Op. at 16-17. But the record reveals that Hakimi placed *twenty-eight* calls to Realza in the period leading up to his arrest, and a rational jury could certainly infer that calls made to "the phone number attributed to Dallas George," Dissenting Op. at 17, were in fact calls made to George himself. In any event, the applicable standard is not whether our court, on review, is "persuaded" by what the testimony "suggest[s]"; rather, the standard is whether any rational trier of fact could reach this conclusion, having drawn all reasonable inferences in favor of the government. See Jackson, 443 U.S. at 319.

34

In addition, the jury heard Anderson testify on cross-examination that *these* conspirators would *not* have conferred this valuable shipment of drugs to a person who was not a trusted member of the organization:

> Q.  Now, were there other people in the organization outside of your family who were involved [with the conspiracy]?
>
> A.  Yes.  Whoever Perla was friends with.
>
> Q.  But there had to be an element of trust involved, right?
>
> A.  Yes.
>
> Q.  And if you didn't trust a person or know the person personally, then you wouldn't want to give them twenty pounds of ecstasy, right?
>
> A.  No.
>
> Q.  Because they could just drive off into the sunset, and you would be out a lot of money?
>
> A.  Yes.

Tr. 235-36.  Defense counsel in fact underscored this point in his summation, asking jurors, "Do you think for a minute that [the conspirators] would have just hand[ed] $900,000.00 worth of narcotics over to someone that wasn't involved with them?" Id. at 339-40.  Thus, the record contains evidence supporting application of what we have called a "common sense" inference *in this case, to this conspiracy*.  Tr. 235-36.

We recognize that the facts adduced in <u>Huezo</u> regarding the nature of the relationship between the defendant and his co-conspirators were more extensive than those produced by the government here.  However, although the government is not permitted to build a conviction on a house of cards, neither is a jury required to leave its common sense at the courthouse door:  "Jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."

35

Huezo, 546 F.3d at 182.  In our case, Hakimi had extensive contacts with the principals, flagged Anderson, followed her to a remote location, and was poised to receive hundreds of thousands of dollars' worth of drugs.  Would the conspirators have trusted Hakimi with an unsealed bag containing $900,000 worth of drugs, yet not trusted him with information about what the bag contained?

It may be possible to imagine a circumstance in which an experienced drug smuggler could decide to entrust a million-dollar package of contraband to an unwitting courier.[14]  There is, however, simply no evidence that the conspiracy at issue in this case ever operated in this fashion.  And the theoretical possibility that it did so on April 16 does not preclude the jury from drawing the inference — in a setting that includes corroborative testimony and circumstances — that an individual who accepts sole custody of valuable contraband was a trusted member of the conspiracy, with knowledge of the contraband's true nature.  In fact, in light of Anderson's testimony regarding the position of trust held by drug couriers *within this very conspiracy*, the jury would have had to disregard uncontroverted evidence to reach the conclusion that Hakimi was an uninformed agent as opposed to a trusted insider.

---

[14]  The apparent use of unwitting couriers, driving their own cars and equipped with commuter passes as they regularly cross the Mexican border and park daily in predictable locations, has been documented.  See, e.g., Criminal Complaint at 4-5, United States v. Chavez, No. 11-3330-G (W.D. Tex. July 1, 2011).  There, the modus operandi seems to be that the principals obtain access to the car on each side of the transport, first to place, and then to retrieve, the shipment.  To prove a defendant's participation in a drug conspiracy under such circumstances, the government would need a juror to infer *both*: (1) that the courier, in fact, knew that he was in possession of contraband; and (2) that he knew the contraband was drugs.

In contrast to <u>Lorenzo</u> and <u>Torres</u>, we find no evidence here that "severely undermines" the inference that Hakimi enjoyed a position of trust within the conspiracy or that he had not been assigned to take custody over the package. On the contrary, there is direct evidence that Hakimi was entrusted with sole possession of a valuable drug shipment, and testimony from a co-conspirator that only a trusted member of the conspiracy would be permitted to serve in such a capacity. Certainly Hakimi has directed us to no evidence that causes us to question the plausibility of the inference in this case.[15]

As additional support for rejecting the jurors' inference of Hakimi's knowledge and role in the conspiracy, the district court ruled that a reasonable juror could "draw no inference about the defendant's knowledge of any plans to distribute these drugs" from the two phone calls between Hakimi and George on April 15 and 16. <u>Hakimi</u>, 832 F. Supp. 2d at 173. Because those calls were both made "hours *before* [Realza] and Anderson began scrambling to find someone to transport the drugs on April 16," the district court reasoned that "Hakimi and [George] could more easily have discussed plans to smuggle Hakimi across the border than plans to smuggle a shipment of drugs to New York City with a value of between $250,000 and $900,000." <u>Id.</u> at 173. The district court erred by focusing on

---

[15] The dissent contends that our majority opinion "outright ignores that principal participants in a drug conspiracy *often do* confide a high-value quantity of drugs to one who is not a trusted member of the conspiracy." Dissenting Op. at 15 (emphasis in original). But, as demonstrated above, the record contains specific testimony that the principals *in this case* – namely, Realza and George – would not have entrusted high-value drugs to someone who was not a trusted member of the organization. In light of that testimony, what other drug conspirators may or may not "often do" does not render the jury's verdict irrational.

an inference it found more plausible instead of deferring to the inference credited by the jury. The jury reasonably may have envisioned alternative scenarios. For example, in those calls Hakimi and George could have agreed to a drug transport plan that Anderson and Realza did not know of until after Realza's call to Anderson. Moreover, although it captured thirty-four such calls, Hakimi's BlackBerry cannot be presumed to reflect every communication between Hakimi and the principals. In this vein, Anderson testified that she was using a walkie-talkie as well as a cell phone to communicate with her supervisors, and Hakimi had purchased a prepaid phone card, suggesting that he made calls on a phone other than his BlackBerry.

Finally, we must evaluate the timing of those calls not in isolation, but as part of a body of evidence that included numerous prior calls between Hakimi and Realza; the April 16 texts highly suggestive of George's expectation that Hakimi would be transporting the drugs (that is, "He[']s got it[?]"); and Anderson's testimony that her job was to deliver the drugs to Hakimi for his further transportation to New York City, see Tr. 218-19 ("Dallas had found somebody else to do it because I didn't want to.").[16] Reviewing the totality of the evidence, we conclude that the district court's observation about the calls' timing neither precludes a reasonable jury from taking those calls into account when assessing the

---

[16] The interpretation consistent with the jury verdict derives further corroboration from Anderson's text message to Realza just before 6 p.m., "R we still goin out??" Gov. Ex. 36. Anderson testified that she and Realza had plans to spend the evening together; had Anderson been planning to drive to New York City and back, there would have been no such plans.

evidence of Hakimi's intent, nor fairly deprives their verdict of being labeled "rational."[17]

* * * * *

We therefore hold that the totality of the evidence presented by the government and the inferences that may rationally be drawn from that evidence amply support the jury's conclusion that, on the evening of April 16, Hakimi, acting as part of a conspiracy with Realza, George, and Anderson, intended to pick up from Anderson a package that he knew to contain illegal drugs, and to deliver it to others for further distribution in the New York City area.[18] We emphasize that the high degree of deference we afford to a jury verdict is "especially important when reviewing a conviction of conspiracy." United States v. Pitre, 960 F.2d 1112, 1121

---

[17] The district court also questioned Anderson's testimony that Hakimi entered her car when it was parked in front of the Wal-Mart (and, not incidentally, sat directly behind the blue bag of drugs). The court observed that no law enforcement officer gave corroborative testimony. 832 F. Supp. 2d at 174-75 n.1. None contradicted Anderson's testimony, however, and it is not clear from the record that any individual officer was necessarily positioned in place or time to have observed the reported interaction. In any event, as we have discussed, Anderson's credibility was not for the court to decide on a Rule 29 motion. "[A]ny lack of corroboration goes only to the weight of the evidence, not to its sufficiency. The weight is a matter for argument to the jury, not a ground for reversal on appeal." United States v. Roman, 870 F.2d 65, 71 (2d Cir. 1989).

[18] The dissent characterizes our majority opinion as holding that the jury may infer Hakimi's knowledge that the bag contained drugs based on a "'trust relationship,' coupled with *nothing more* than the defendant's mere presence at the site . . . ." Dissenting Op. at 1 (emphasis added). But the inference drawn by the jury and that we uphold is based on much more, including, among other things: (1) twenty-eight calls between Hakimi and Realza within the period leading up to Hakimi's meeting with Anderson; (2) six calls between Hakimi and George, including one call on the day of the planned delivery; and (3) testimony from a co-operating witness (Anderson) that (i) George assigned Hakimi – the man Anderson was to meet at the Wal-Mart – to transport the drugs; (ii) Hakimi whistled at Anderson to get her attention at the Wal-Mart; (iii) Hakimi entered Anderson's vehicle and sat in the passenger seat, with the bag of drugs at his feet; and (iv) when Anderson stated she did not want to "do it" in the Wal-Mart parking lot – which, according to her testimony, meant "for [Hakimi] to take the drugs," Tr. 221-22 – Hakimi answered, "Okay," and followed her to a secluded area.

39

(2d Cir. 1992). As we have often observed, "This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Id. (internal quotation marks omitted). Accordingly, we have commented:

> It is improbable that the parties will enter into their illegal agreement openly; it is not necessary, in fact, that all the parties ever have direct contact with one another, or know one another's identity, or even communicate verbally their intention to agree. It is therefore unlikely that the prosecution will be able to prove the formation of the agreement by direct evidence, and the jury must usually infer its existence from the clear co-operation among the parties.

Nusraty, 867 F.2d at 762 (quoting Developments in the Law — Criminal Conspiracy, 72 Harv. L. Rev. 920, 933 (1959)). This does not mean, of course, that the government can or should be relieved of its burden of proof, or a jury permitted to draw unreasonable inferences. But, to summarize, where, as here, the evidence is sufficient for a jury to find that: (1) a conspiracy existed to transport drugs from near the Canadian border to the New York City area; (2) the defendant sought to receive from one of the conspirators a package that he intended to transport as described; (3) the defendant knew the package contained illegal contraband; (4) the contraband was, in fact, a highly valuable shipment of drugs, which was to be entrusted to the defendant's sole custody and control; (5) the defendant would only be placed in such a position if he were a trusted member of the conspiracy (according to a co-conspirator's testimony); and (6) the defendant had placed dozens of phone calls to the principals of the conspiracy leading up to the time he was to receive and transport the shipment, a jury is then entitled to conclude that the

40

defendant was a trusted conspirator who knew the conspiracy's objectives and intended that they be realized.[19]

For the foregoing reasons, we reverse the decision of the district court granting Hakimi's motion for acquittal on the conspiracy count.

### 3.    Attempt charge (Count Three)

To prove attempt, the government must establish beyond a reasonable doubt that the defendant "(a) had the intent to commit the object crime and (b) engaged in conduct amounting to a substantial step towards its commission." United States v. Farhane, 634 F.3d 127, 145 (2d Cir. 2011). "[F]or a defendant to have taken a 'substantial step,' he must have engaged in more than 'mere preparation,' but may have stopped short of 'the last act necessary' for the actual commission of the substantive crime." United States v. Celaj, 649 F.3d 162, 171 (2d Cir. 2011) (quoting United States v. Yousef, 327 F.3d 56, 134 (2d Cir. 2003)).

As we have discussed in connection with the conspiracy charge, the evidence was sufficient for the jury to find that Hakimi knowingly intended to possess, with

---

[19] The dissent constructs a hypothetical involving a bag full of diamonds rather than drugs in an effort to challenge our holding that a reasonable jury could infer that Hakimi had knowledge of the drugs at issue in this case. Dissenting Op. at 2-3. We note, however, that the diamond hypothetical contains certain key facts that are plainly inconsistent with the record before us. For example, in the hypothetical, the man rents a car on his own behalf, and does so only *after* he agrees to the smuggling scheme; in the case at bar, the car was rented several days *before* the events at issue, and in a *different* person's name in a remote city. This lends support to the inference that Hakimi was a trusted member of the conspiracy, as neither George nor Realza would have the information to trace the rental car if Hakimi chose to drive off with the drugs rather than deliver them to the intended recipient. Further, in the hypothetical, the bag was merely "in the man's view," Dissenting Op. at 3; here, however, Hakimi entered Anderson's vehicle and sat in the "passenger's seat where the drugs were sitting . . . on the floor." Tr. 221-22. Police photographs showing the size and location of the duffel bag drawn from the trial record are attached to this opinion as an addendum.

41

an intent to distribute, the drugs at issue. Hakimi's conduct also constituted a "substantial step" towards commission of the crime. He coordinated the transfer of drugs with the traffickers; he traveled to the pre-arranged meeting location; and he followed Anderson to a secluded spot to complete the transfer. Indeed, Hakimi did everything within his power to complete the crime of unlawful possession of a controlled substance; it was only through the intervention of law enforcement that the imminent drug transfer did not occur. Cf. Farhane, 634 F.3d at 147 (explaining that government failed to prove defendant took a "substantial step" towards possession of heroin where there was no evidence of "any act to effect possession, such as acquisition, or attempted acquisition").

For the foregoing reasons, we reverse the decision of the district court granting Hakimi's motion for acquittal on the attempt count.[20]

## CONCLUSION

For the reasons stated above, we REVERSE the district court's judgment of acquittal and REMAND with instructions for the entry of judgment in accordance with the jury's verdict, and for further proceedings consistent with that verdict and this opinion.

---

[20] The government has also requested that we assign this matter to a different judge on remand. We decline to do so under the circumstances of this case.

# Addendum





Hall, Circuit Judge, dissenting:

The majority holds today that a jury may now infer a defendant's knowledge of the contents of a bag he never possessed based simply on the fact, demonstrated at trial, that the bag contained "high value" drugs and there exists a record of some number of phone calls of unknown content between the defendant's cell phone and the cell phones of the principals of the conspiracy. Maj. Op. 27–28. The holding relies on what the majority characterizes as a "common sense" determination that the high value of the drugs in the bag is evidence of a significant trust relationship when considered in conjunction with third-party testimony about the state of mind of the principals of the conspiracy. Maj. Op. 28. The majority further reasons that this "trust relationship," coupled with nothing more than the defendant's mere presence at the site where government agents foiled, and thus completely prevented, what was to have been a transfer of the bag to the defendant, permits a jury to infer that the defendant knew that there were controlled substances inside the bag. *See* Maj. Op. 27–28. Relying on cases in which this court has upheld the jury's inference of a defendant's "knowledge" based on the facts in evidence, the majority ignores that in each of those prior cases, the well-developed evidence showed that those defendants whose knowledge of the specific object of the conspiracy was inferred (and thus their conspiracy convictions upheld) also played insider roles in those conspiracies. Notwithstanding the absence of such long-recognized corroborating evidence in this case, the majority nonetheless reverses the district court's decision to acquit the defendant based on insufficient evidence of his knowledge of the object of the conspiracy. Instead, the majority holds that the evidence presented was sufficient to prove the defendant's knowledge that what he was assisting the other conspirators to do was to transport drugs. Maj. Op. 28–29; *see, e.g.*, *United States v. Huezo*, 546 F.3d 174, 184 (2d Cir. 2008).

1

This result is an erroneous and dangerous departure from our recent precedents in *Torres* and *Lorenzo*, and similar holdings in cases of the same lineage. *See, e.g.*, *United States v. Torres*, 604 F.3d 58 (2d Cir. 2010); *United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008); *United States v. Ogando*, 547 F.3d 102 (2d Cir. 2008); *United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004); *United States v. Jones*, 393 F.3d 107 (2d Cir. 2004); *United States v. Friedman*, 300 F.3d 111 (2d Cir. 2002); *United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001); *United States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989); *United States v. Gaviria*, 740 F.2d 174 (2d Cir. 1984); *United States v. Soto*, 716 F.2d 989 (2d Cir. 1983). Worse, such a holding radically eases, if not eliminates altogether, the burden on the government to prove beyond a reasonable doubt the defendant's knowledge and specific intent to commit the crimes that are the charged object of the conspiracy. I offer an illustrative hypothetical of the dangers that are now unleashed.

A Canadian national who immigrated illegally to the United States to avoid pending felony proceedings somehow makes contact with a group of people who are known to him to smuggle people back and forth across the Canadian border. There is no evidence how he came to know the group of smugglers, but we do know that this man is wanted by Canadian authorities and cannot simply drive back over the border to return to his native homeland. Accordingly, he makes numerous contacts with two members of this smuggling group. Given this man's prior criminal experience, we can infer that he realizes this "safe" route is also a conduit used for smuggling goods—probably even drugs—alongside people. As part of his attempt to make his way back to Canada, one of his smuggler contacts tells him to meet a woman in a shopping mall parking lot in a city in upstate New York. We do not know explicitly whether this is for a bag drop, or simply to receive directions to the smugglers' border notch where the crossing back into Canada will take place. But we can infer that he has been asked to take a bag, drop it off in New

2

York City, drive back upstate through New York to meet the smugglers, and be smuggled across the border back to Canada by morning.

The man agrees. He then rents a car—an action that is markedly inconsistent with the smuggling group's known transportation procedures—and rendezvouses with the woman to pick up the bag and begin his circuitous trek back to Canada. They meet at the shopping mall, agree to exchange information in a more private place, and the man follows the woman to a cul-de-sac. The man then tells the woman he has a New York City address for the first stop, but needs GPS coordinates of the smugglers' location. As the woman begins to enter the address into the man's GPS device, the police frustrate the exchange. All the while, the man neither possessed nor even inquired about the bag. Although the bag was in the man's view when he first met the woman at her car at the shopping mall, she did not identify or speak to him about the bag. The police seize the bag, look inside, and discover hundreds of thousands of dollars worth of stolen diamonds. During the arrest, the man makes false statements about his whereabouts prior to meeting the woman. The woman, a longtime associate of the smuggling group, agrees to cooperate with the government. Although the woman had never seen the man before, the woman informs the government the man must have been "trusted" since the principals of the conspiracy are paranoid about losing out on the street value of their contraband. The man now faces conviction under 18 U.S.C. § 2314 and 18 U.S.C. § 371 for conspiracy to transport stolen diamonds.

This hypothetical highlights the important distinction between one who is a trusted member of a conspiracy, such as an insider who may well have knowledge of the conspiracy's objectives (i.e. the nature of the contraband, such as narcotics or stolen goods), and one who is merely trusted to deliver a package, who may only know that he is to transport a package from point A to point B. Such a distinction is important in the context of proving a defendant's

3

criminal liability for membership in a conspiracy because "the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent."  *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010).  Moreover,

> [a]lthough "[t]he government need not show that the defendant knew all of the details of the conspiracy, 'so long as he knew its general nature and extent,' " *[United States v.] Huezo*, 546 F.3d at 180 (quoting *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir.), *cert. denied*, 513 U.S. 879 (1994)), the government "must prove at least the degree of criminal intent necessary for the substantive offense itself," *United States v. Feola*, 420 U.S. 671, 686 (1975). "[T]he knowledge of the parties is relevant" to a conspiracy charge "to the same extent as it may be for conviction of the substantive offense." *Id*. at 695.

*Torres*, 604 F.3d at 65.  A defendant's suspicious behavior absent proof of his "knowledge that his conduct involve[s] narcotics," when seeking to convict him of participation in a drug conspiracy, *id.* at 66, or absent proof of knowledge that his conduct involves "receipt or possession of stolen goods," when seeking to convict him of conspiracy to receive and possess stolen goods, *see Samaria*, 239 F.3d at 236, is insufficient to sustain a conviction.  *Id.*; *see also Lorenzo*, 534 F.3d at 160–62.

Requiring the government to prove a defendant's knowledge of the general nature and extent of the conspiracy, whether it involves stolen goods or drugs or some other contraband, is intrinsically important, of course, because there is no statute simply criminalizing transportation of "high value contraband."  Indeed, such a statute would likely be void for vagueness.  *See, e.g.*, *Lanzetta v. New Jersey*, 306 U.S. 451, 452 (1939) (striking down state statute criminalizing "gangsters" for failure to provide notice as to what qualified as a "gang"); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("[L]aws must provide explicit standards" without "impermissibly delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."); *see also Farid v. Ellen*, 593 F.3d 233, 241 (2d Cir. 2010) (holding

4

unconstitutionally vague prison regulations that, as applied to prisoner, banned "smuggling" and "contraband"). Yet, despite underlying statutes criminalizing possession that require proof of the defendant's knowledge of the nature of the contraband, the majority posits that if such contraband is of "high value," then "common sense" dictates that the defendant simply must have known its nature by virtue of the fact he was acquainted with the conspiracy's principals. *See* Maj Op. at 34–35. Under the majority's newly articulated rule, therefore, our hypothetical man—despite neither possessing the contraband nor *actually* knowing its nature—can be convicted of *any* possession-related conspiracy simply because we can infer he was willing to perform *some* illicit activity for people with whom he was somehow acquainted.[1]

Of course, the above hypothetical virtually tracks this case's evidentiary record, save some rhetorical flourish. Both Hakimi's and the hypothetical man's role, unlike the defendant in *Huezo*, do not bear the usual hallmarks that this Court's long line of cases addressing the element of knowledge has identified as presenting the requisite evidentiary "indicia of the *specific* elements of the underlying crime." *Samaria,* 239 F.3d at 235 (emphasis added); *see also Torres*, 604 F.3d at 67.[2]

Nonetheless, the majority frames Hakimi's "mere presence at the scene of an aborted drug transfer," evidence we have held as insufficient in the past, *United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir. 1989), as "impending sole possession." Indeed, Hakimi's "mere association with . . . some or all of [the alleged co-conspirators who] may have been links in a chain of narcotics distribution," another legally insufficient indicator, *id.*, is instead evidence of

---

[1] Even though there is no evidence that the defendant ever saw or was ever told what was in the bag, the government may now prove that the defendant knew the conspiracy involved controlled substances, trafficked in violation of title 21 of the United States Code, or stolen diamonds, trafficked in violation of title 18 of the United States Code, merely by looking into the bag after it has been seized and deciding, based on the contents of the bag, which label to assign and which conspiracy to charge.

[2] The majority, too, recognizes that *Huezo* presented "more extensive" evidence regarding the nature of the relationship between that defendant and his co-conspirators. Maj. Op. 35.

5

being "well-acquainted" and "well-connected" despite the record being devoid of any content of those calls. *See* Maj. Op. 34. Lastly, the majority relies on the testimony of an admitted co-conspirator, who had never before seen Hakimi, that Hakimi "must have been trusted" by the principals of the conspiracy, despite our caution that such testimony "may be probative of *their* state of mind, but it is not probative of *his*." *United States v. Ogando*, 547 F.3d 102, 108 (2d Cir. 2008). No matter how the majority wishes to frame these facts, *Torres*, *Lorenzo*, and their precedential forebearers have long precluded the majority's determination in this case. For these reasons, and the reasons discussed below, I respectfully dissent.

## I.      Conspiracy

The majority rightly sets forth the Court's requirements to sustain a conspiracy conviction, and I concur with the majority that there was evidence to support a rational juror's inference that there existed a conspiracy involving the exchange of contraband. Maj. Op. 15–16, 19–25; *see also Torres*, 604 F.3d at 68–69 (noting that suspicious conduct, "nervous" appearance, and false exculpatory statements can support an inference that a defendant knew packages contained contraband). I disagree, however, with the majority's conclusion that there was sufficient evidence for a rational juror to conclude, beyond a reasonable doubt, that Hakimi was a "trusted insider" with the requisite knowledge of and specific intent to transport drugs so as to support his conspiracy conviction for a controlled substance offense.

### A.  Specific Intent to Commit the Offenses Underlying the Conspiracy

To sustain a conspiracy conviction, the government must present "evidence from which it can be reasonably inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008). "The government need not show that the defendant

6

knew all of the details of the conspiracy," *Huezo*, 546 F.3d at 180, but it "must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola*, 420 U.S. 671, 686 (1975). Here, therefore, the government must have proffered evidence sufficient for a juror to infer rationally that Hakimi conspired to know or intend to "distribute" or "possess with intent to . . . distribute . . . a *controlled substance*." 21 U.S.C. § 841(a)(1) (emphasis added); *see also* 21 U.S.C. § 846. Such an inference must be "sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Friedman,* 300 F.3d at 124 (internal quotation marks omitted); *see, e.g.*, *Rodriguez*, 392 F.3d at 544; *Torres*, 604 F.3d at 66.

Absent "proving that the defendant knew he was dealing with a *controlled substance*," not simply high-value contraband, the government "cannot establish [a 21 U.S.C.] § 846 conspiracy to distribute or to possess with intent to distribute" a controlled substance. *Id.* (emphasis added); *see also Rodriguez*, 392 F.3d at 545 (noting that "the conspiracy and substantive [possession] charges, both of which are specific intent crimes, required the government to established that [the defendant] knowingly and intentionally participated in a *drug deal*" (emphasis added)). """"Proof that the defendant knew that *some* crime would be committed is not enough."""" *Rodriguez,* 392 F.3d at 545 (quoting *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004) (quoting *Friedman*, 300 F.3d at 124) (emphasis in *Friedman*)). Likewise, "[p]roof that the defendant engaged in suspicious behavior" is also legally insufficient. "Evidence tending to show knowing participation in the conspiracy is also needed," *United States v. Soto,* 716 F.2d 989, 991 (2d Cir. 1983), such as "facts sufficient to draw a 'logical and convincing connection' between circumstantial evidence of an agreement, and the inference that an agreement was in fact made." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004)

7

(quoting *United States v. Gore*, 154 F.3d 34, 41 (2d Cir. 1998)). Indeed, the lynchpin for sustaining a defendant's "conviction for conspiracy to traffic in narcotics" remains proof of the defendant's specific "knowledge that his conduct involved narcotics." *Torres*, 604 F.3d at 66; *see also Lorenzo*, 534 F.3d at 160–62.

Proof of a defendant's knowledge or intent may be established through "evidence that the defendant participated in conversations directly related to the substance of the conspiracy," "possess[ion of] or mention[ ] in documents important to the conspiracy," "proof that a defendant exercised authority within the conspiracy itself," "recei[pt of] a share of the profits from the conspiracy," or the defendant's statements "explicitly confirm[ing] the nature of the activity in which the co-conspirators were engaged." *Samaria*, 239 F.3d at 235–36. Evidence that "merely establishes that [a defendant] associated with conspirators under suspicious circumstances and suspected (or should have suspected) that a crime might occur," is not specific enough. *Friedman*, 300 F.3d at 126 (internal quotations, alterations, and citations omitted). Although this list is not exhaustive, it is beyond cavil that we do not lightly permit inferences of a defendant's knowledge of the object of the conspiracy to be drawn absent some indication that the defendant had some knowledge of the conspiracy coupled with either specific evidence the defendant occupied a "trusted" role in the conspiracy or other circumstantial evidence bearing on the defendant's knowledge of the nature of the object of the conspiracy. This is meant to distinguish proof of knowing participation in a criminal conspiracy from cases in which the evidence shows only that "the defendant played a role subordinate to that of the principal engaged in the criminal conduct charged, and the defendant plausibly could have fulfilled that role without knowing the scheme's criminal nature." *See United States v. Davis*, 690 F.3d 127, 131 (2d Cir. 2012).

8

## B. "Trusted" Conspiracy Members

The majority relies on two primary inferences to show Hakimi's guilty knowledge: (1) drug traffickers are "very unlikely to confide" high value drugs to the "sole control of a person who was not a trusted member of the conspiracy" and (2) such a "trusted member of the conspiracy may reasonably be expected to have knowledge of the nature of the conspiracy" to distribute illegal drugs.[3] Maj. Op. at 27–28. Now that this Circuit, through the majority, endorses such inferences as rational on this record, virtually any time the government can establish the "high value" of contraband and the defendant's "impending" sole possession of it, a jury may be instructed simply to infer that the defendant is trusted by the conspirators and may therefore impute knowledge of the nature of that contraband to the defendant. The holding effectively guts our prior holdings that knowledge may not be proven when there is no specific evidence as to the nature and operation of the conspiracy and the defendant's role in it nor evidence of the defendant's prior conduct which is of the sort that suggests his knowledge of the objects of the conspiracy. *See, e.g.*, *Lorenzo*, 534 F.3d at 160; *Torres*, 604 F.3d at 63; *Samaria*, 239 F.3d at 238. Indeed, in my view, the holding permits a standard that risks the constitutionally impermissible jury determination "that the defendant is *probably* guilty." *Lorenzo*, 534 F.3d at 159 (internal alterations and quotation marks omitted).

---

[3] The majority also relies obliquely on the fact that the duffel bag was unsecured (i.e., not sealed) as "strong evidence of Hakimi's trusted status," which in turn supports its conclusion that Hakimi knew the bag contained narcotics. *See* Maj. Op. at 35 & n.12. The argument that Hakimi could "do with [the drugs] as he wished" because the drugs were in a duffel bag rather than in a taped box or sewn into a garment, is, with all due respect, a red herring that proves nothing about Hakimi's possible knowledge of the bag's contents at the time he was arrested, *see id.*,and demonstrates to a significant degree the circularity in the majority's reasoning. If he knew the nature of the contraband, he could just as easily flee with the goods whether they were in a sealed box, sewn into a dress, or simply zippered up in a duffel bag. If he did not know what the package contained, finding out would take nothing more than a knife or pair of scissors regardless of how the goods were packaged. To the extent the majority implies that couriers can somehow get away with pilfering a few bags of narcotics more easily when they are in an unsealed duffel bag—and thus couriers who are given duffel bags are trusted insiders—that argument is also a flawed. *See id.* To suggest that recipients would not inspect the package upon delivery, or that senders would not look first to their courier upon receiving a complaint that the package was light defies common sense.

9

Nonetheless, the majority primarily relies on *Huezo*, *Abelis*, and *Sisca* to suggest we have endorsed an inference of a "trust" relationship, and thus proof of specific knowledge of the purpose of the conspiracy, merely by proving that the value of the contraband is high and showing that the defendant was poised to take sole possession of that contraband. This argument is wrong for two reasons. First, the majority opinion is a misapplication of our prior holdings, divorced from the substantial circumstantial evidence those cases relied on in support of an inference that the defendant had a "trusted" status within that conspiracy. Second, permitting such an inference on a record like this one ignores the fact-dependent nature of our case law addressing the element of knowledge and erects an overbroad rule that ignores the factors distinguishing between the activities of known, trusted couriers and mere patsies.

*Huezo* is particularly ill-suited to provide guidance in this case. In *Huezo*, a split panel held that "common sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds" when considered in conjunction with "the complexity and scale of the money laundering scheme." 546 F.3d at 182. The scheme in *Huezo* was a sophisticated international conspiracy involving a "major Colombian money broker" who laundered over $50 million of drug proceeds. *Id.* at 181. Shortly before the transactions, the defendant traveled from California to Connecticut with the co-conspirators and loaned them his Jeep for an initial drop-off planning meeting with an undercover agent posing as a conspirator. *Id.* at 182. Three days later, he accompanied his co-conspirators and "drove a suitcase containing $500,000 to a meeting with [the undercover agent] and unlocked the trunk from the driver's seat to allow [the agent] to remove the suitcase." *Id.* Two days later, he "'basically help[ed] to guard' the movement of a second suitcase containing $500,000" into his own car,

10

then drove his co-conspirators to a second, planned drop-off meeting.  *Id.*  All the while, "he shared a residence and socialized with" his co-conspirators at "the same house where all of the money was kept."  *Id.*  "Moreover, there was evidence that [he] personally took possession of the small bag containing $6000," his payment, "that he placed it behind his own seat in the Jeep, and that the money was packaged similarly to the $500,000 in the larger suitcases."  *Id.*

On that record demonstrating (1) the defendant's extensive contact with the money and the principals of the conspiracy, (2) the complexity of the scheme, (3) and the defendant's receipt of a share of the profits from the conspiracy, the jurors were permitted "to rely on their common sense and experience in drawing inferences" of the defendant's knowledge and specific intent sufficient to sustain a conspiracy conviction.  *Id.  Huezo* requires much more than "common sense" and high-value contraband to support an inference that a defendant is a "trusted" conspiracy insider.

For that reason this Court has already suggested an "analogy to *Huezo* is inapt" to a case similar to this one when packages containing a million-dollar cocaine shipment were addressed to the defendant.  *Torres*, 604 F.3d at 70.  Despite the proof of the defendant's dogged attempts to pick up the packages, we held this to be insufficient because "the government presented no evidence as to the *nature* of [the defendant's] associations with the" the conspiracy principals who sent the packages.  *Torres*, 604 F.3d at 71 (emphasis added).  In *Torres*, too, "[t]here was no evidence of a sizeable payment to [the defendant] that might reflect an expectation related to the million-dollar street value of the [illegal drugs]," "no evidence by [the defendant] other than his efforts to gain possession of [the drugs]," and no "evidence that [he] was placed in a position of trust" despite his name being on the parcels containing the drugs.[4]  *Id.*  The record here is equally

---

[4] The majority attempts to dispel *Torres* as inapposite simply because the defendant there had "no prospects of having sole dominion over" the illegal drugs.  While it is true that the defendant was accompanied by other men

11

devoid of such evidence. Although we know Hakimi had contact, perhaps even "extensive" contact as the majority suggests, we know nothing of the "nature" of those contacts. Furthermore, there is no evidence of payment, no evidence of his role other than his meeting with Anderson, and no evidence of his trusted status in the conspiracy other than third-party testimony similar to that we rejected in *Ogando*, 547 F.3d at 107. Accordingly, *Huezo*'s "common sense" inference should be confined to situations with similar substantial records showing a defendant was participating in a sophisticated conspiracy unlike the pedestrian drug-running operation we have here.

Indeed, the other precedent on which the majority relies is equally inapposite as support for its more lenient test for inferring a defendant's knowledge of the purpose of a conspiracy. To support the idea that "impending sole possession" coupled with high-value contraband—absent a showing of the nature of the defendant's relationship with the principals of the conspiracy or the defendant's role in the conspiracy—supports a "trusted conspirator" inference, the majority relies on *United States v. Abelis*, 146 F.3d 73 (2d Cir. 1998). In *Abelis*, we rejected a challenge to the sufficiency of the evidence to support a conviction for conspiracy to commit extortion. In so doing, we noted that "the jury was entitled to place great weight on the fact that the other conspirators trusted [the defendant] to safeguard [a] $3.5 million payment that was to be made into an offshore bank account to which [the defendant] was the sole signatory." *Id.* at 81. While straight monetary payment certainly presents a different scenario from the one we address here,

during his attempted pick-ups, we paid equal weight to the fact that the packages "although addressed to him in name, could not be received by him in a location that he controlled; they were not addressed to his home (if he had a home) but rather were addressed to him at a place with which he was not shown to have any connection." *Id.* at 71. Furthermore, the majority's "impending sole control" does little to refute "an inference that [a defendant] became involved in the conspiracy by happenstance and not by design," *see, e.g.*, *Samaria*, 239 F.3d at 231 (reversing a conspiracy conviction despite evidence that the defendant permitted conspirators to load a box containing stolen goods into his car, appeared to serve as a "lookout," and drove the conspirators to another location where they picked up and loaded additional boxes into a yellow cab), or even that the defendant's "impending sole possession" was "consistent with participation in a wide variety of offenses," *Lorenzo*, 534 F.3d at 161, such as transporting stolen diamonds, for that matter.

12

we mentioned the evidence of this multi-million dollar payment as a basis for inferring "trust" only after extensively reviewing other circumstantial evidence present in the record: (1) the "evidence showed that [the defendant] was a close friend of both [co-conspirator principals]"; (2) one principal stayed in the defendant's home and used his home telephone to call the other principal; (3) the defendant "was present at and participated in key meetings involving the payment" of the extorted money; (4) the defendant attended a key meeting to put extra fear in and pressure on the victim to cause him to pay; (5) statements indicated the defendant had a past understanding of the victim's previous promises to pay money in exchange for protection; (6) he attempted to get the victim to pay; (7) he and two of his associates drove the two principals of the conspiracy for two-hours "late at night in a rainstorm" to meet up with the two victims who had been taken there by other associates; (8) he typed on a computer the "agreement" to pay the extorted money; and lastly, (9) he provided his offshore bank account to serve as the repository for the extorted funds. *Id.* Only in light of this additional extensive evidence in the record did we hold that the defendant's "active participation in the evening's events—typing the contract and providing his bank account as the destination of the funds—as well as his presence at the signing of the agreement, could reasonably be interpreted as acts in furtherance of the conspiracy." *Id.* The facts relied on in *Abelis*, therefore, are so much more robust than those in the thin record before us that *Abelis* has little application where, as here, there is no evidence demonstrating the nature of the defendant's role or association with alleged co-conspirators.

Other cases on which the majority relies have equally extensive records demonstrating the nature of the relationship between the defendant and the principals of the conspiracy and the defendant's role in the conspiracy. *See United States v. Sisca*, 503 F.2d 1337, 1343 (2d Cir. 1974) (noting evidence showed the defendant met with principles of the conspiracy, owned "and

13

shared with his wife exclusive possession of a house found strewn with narcotics and various other paraphernalia of a heroin trafficking operation," was "presen[t] on the premises while others entered and left carrying containers of heroin," and was entrusted with $60,000 in cash, permitting the inference that he "performed the critical role of maintaining the 'stash' or 'safe haven' for the distribution operation"); *United States v. Ramirez*, 320 F. App'x 7, 10 (2d Cir. 2009) (summary order) (noting evidence showing, *inter alia*, that defendant exchanged a pre-arranged code-word with an undercover officer, the defendant "had almost half a million dollars in cash in a suitcase in the cab's trunk," removed the cash-filled suitcase from the trunk and gave it to the undercover officer, confirmed that "[i]t's all there" in response to the officer's question, "Everything's in there, right, five?," as well as proof that he drove his livery cab to the building from which a call arranging the money-drop meeting had been placed and, after a conversation, permitted a man to place a box containing five kilograms of cocaine in the trunk of his cab before circuitously and evasively driving to a location in Queens where he flashed his headlights at an approaching car and conversed with its driver before opening the trunk of his cab to allow the driver to remove the cocaine-filled box); *United States v. Aleskerova*, 300 F.3d 286, 293–94 (2d Cir. 2002) (noting the defendant had "extraordinary travel plans" from Azerbaijan to New York coinciding with a crucial meeting where she was to facilitate the sale of stolen art, actually had handled the stolen art, knew the combination of the locked suitcase in which the art was secreted, provided "bank account information written in [her own] handwriting [ . . . so as] to share in the proceeds of the sale," and, only "in the absence of evidence of any relationship . . . outside of the conspiracy" between the defendant and her co-conspirator was an inference permitted to be drawn that phone calls of unknown content were "in furtherance of the conspiracy" (alterations omitted)). Each case permitting the inference of a "trusted" relationship

14

relies on an evidentiary record demonstrating much more than a showing, as here, of only "imminent" (rather than actual) sole control of highly valuable contraband and phone calls of unknown content. Indeed, in each of those cases, the defendant *already had* sole control of the contraband, had extensively participated in the conspiracy, or had demonstrated insider knowledge about the objects of the conspiracy. Only then did we approve as rational an inference that the defendant was a "trusted insider" or had knowledge of the nature of the contraband. The majority here erroneously crafts a broad, overarching legal principle out of mere morsels of these fact-intense sufficiency reviews, and worse, the logical inferences the majority endorses on this record are ones that significantly diminish the evidentiary burden the government must shoulder to sustain a conspiracy conviction.[5]

In fact, the majority's holding endorses generalizing in a way that belies our case-by-case factual inquiry into whether there is sufficient proof of a defendant's knowledge in conspiracy cases and outright ignores that principal participants in a drug conspiracy *often do* confide a high-value quantity of drugs to one who is not a trusted member of the conspiracy. The evidence presented at trial does not carry the indicia of specific knowledge sufficient to permit a jury to infer that Hakimi knew that the contraband at issue was a controlled substance. Indeed, this case's facts provide a bright contrast to all cases on which the majority relies.

---

[5] The majority also asserts that our sister circuits have adopted similar inferences on records similar to the one here. On close examination, however, in each case there was more extensive evidence presented at trial to warrant such an inference than was presented in this case. *See, e.g.*, *United States v. Gbemisola*, 225 F.3d 753, 759–60 (D.C. Cir. 2000) (noting that travel to a distant city, the suspicious manner in which packages were retrieved, use of false names on mailboxes, and defendant's actual removal of contents from the package coupled with the use of the false bottom pots which presented a hazard to an innocent recipient supported an inference of knowledge); *United States v. Quilca-Carpio*, 118 F.3d 719, 721–22 (11th Cir. 1997) (holding that, in an airport-smuggling case, a jury *may* infer knowledge from the high-value nature of cargo in defendant's care, but noting that in this specific case it was reasonable to infer knowledge about the contents of *his own* luggage given that it was unlikely for a 'prudent smuggler' to entrust high value cargo to an innocent person (especially in that innocent person's own luggage) and it was unlikely defendant was unaware of the contents of his bag given its unusual weight); *United States v. Uriostegui-Estrada*, 86 F.3d 87 (7th Cir. 1996) (observing also that the jury could infer knowledge from defendant's possession and control of one million dollars in heroine and suspicious travel history)

15

Cheyenne Anderson testified that Perla (Daisy Realza) was the ringleader of sorts. Typically Perla, never Dallas George, would contact Anderson about doing a "run." She or Joe Mason, the usual couriers, would pick up the drugs from a boat docked at the reservation. The boat was normally operated by her cousin, Dustin George, the brother of Dallas George. She and Mason were typically escorted by look-out or blocker vehicles. Anderson would arrange for her own escorts. Anderson also took a passenger to help her drive. She did not use rental cars because rental cars were red flags for police officers. Anderson, once she reached New York, would pick up cocaine to bring back to Perla. Dallas George, Anderson testified, was not reliable to receive a transfer of drugs because he was on drugs. Anderson also testified that it was her family connection to the organization, which at one point had been run by her family, that made her a trusted member.

Hakimi, not previously known to Anderson as a person involved in the organization, was not asked to pick up the drugs from the boat or even from Anderson's apartment, as trusted members of the conspiracy are asked to do. Rather, Hakimi was instructed to go to the Massena Wal-Mart. Hakimi arrived in a rental car, which a regular member of the organization would not have done. He was unfamiliar with the reservation area. Additionally, accepting that Dallas George was the contact point in common between Anderson and Hakimi, which was out of the ordinary given Anderson's testimony that she dealt only with Perla, Dallas George's text messages to Anderson checking on the status of the situation that day are also suggestive that Hakimi was not an insider. To that end, I am not persuaded that Hakimi's post-arrest statements to Anderson suggesting that he knew Perla, phone calls of an unknown nature between Perla and him, and his few contacts with the phone number attributed to Dallas George are sufficient, without more, to support an inference that he is a trusted member of the conspiracy. Indeed, the

16

call logs for April 15 and 16, 2011 reveal that the phone in Hakimi's possession placed a call to the Dallas George number around 1:51 pm on April 15. That phone placed a second call on April 16 at 11:49 am. The government, during the Rule 29 hearing, stated that those calls totaled little more than 6 minutes in length. Moreover, all of Hakimi's calls with Perla and Dallas George took place hours or days *before* Perla or Dallas George had asked Anderson to do the run and learned that Anderson could not do the run.

At most, from this record, the jury could infer that Anderson was not going to be able to do the run as planned, thus causing Perla and Dallas George to make emergency arrangements which involved an outsider, Hakimi, picking up the package from Anderson at a different location than the conspiracy normally used according to Anderson. The reason Hakimi was chosen or the nature of his prior relationship with Dallas George or Perla is unknown. Hakimi had minimal contact with Dallas George in the period leading up to the transfer. Hakimi was insulated from the sensitive aspects of the operation that known, trusted couriers were involved with—such as picking up the package at the boat, or even direct contact with the leader, Perla. I cannot agree, therefore, that the sparse record in this case supports any inference by a jury that Hakimi was a "trusted conspirator" such that they could then infer that Hakimi had specific knowledge that what he was going to be transporting was drugs.

Given the distinguishing factors between the activities of the known, trusted couriers in the conspiracy underlying this case—Cheyenne Anderson and Joe Mason—and the manner in which Hakimi was operating, such a "common sense" assumption by the jury can amount to nothing more than speculation. *See Torres*, 604 F.3d at 67 ("[T]he jury's inference must be reasonably based on evidence presented *at trial*, not on speculation[.]" (internal quotation marks omitted)). Admittedly, as highlighted by the majority, we have suggested that committing highly

17

valuable contraband to the defendant's sole possession, involvement of the defendant in sensitive stages of the conspiracy, and the defendant's relationship and level of contact with his co-conspirators can establish an inference that the defendant does have the requisite knowledge to be guilty of conspiracy. In my view, however, the record before the jury—and before us on review—lacks any of the traditional hallmarks of a trust relationship between Hakimi and the principals so as to support a conclusion that Hakimi was a "trusted conspirator" with knowledge of the drug conspiracy.

Moreover, as suggested above, our precedent holds that knowledge can be inferred from a number of factors. We have affirmed convictions, however, only when such inferences are not speculative and are supported by some showing of specific evidence as to the nature and operation of the conspiracy and the defendant's role in it or the defendant's prior conduct suggesting knowledge of the objects of the conspiracy. *See, e.g.*, *Aleskerova*, 300 F.3d at 293–94. Indeed, even the specific facts underlying the holdings in each of the cases cited by the majority make clear that additional corroborating factors were important, if not crucial, components of the jury's findings and of our subsequent reviews. Our deference to a jury's verdict cannot be the basis for deferring to logically deficient inferences unsupported by a showing of anything more than phone calls of unknown content and a defendant's proximity to high-value contraband over which the conspirators intended him to have sole control. I therefore cannot join a decision which, in my view, departs too far from the limits of *Torres* and *Lorenzo* and permits a jury to infer knowledge only from defendant's possession of a high-value item, from which, the majority says, the jury could also infer a trust relationship. Such a result all but eliminates the government's burden to prove knowledge beyond a reasonable doubt in possession conspiracy cases.

18

## C. Our Case Law on The Issue of Knowledge

As discussed, there is little support in our holdings in *Huezo*, *Abelis*, or *Sisca*, or even in the jurisprudence of our sister circuits, warranting a rule that imminent future (but not present) sole control, when considered with regard to high-value contraband and unknown associations with the principals of a conspiracy, supports the inference that the person about to receive the contraband is a "trusted conspirator."  Although the majority contends that such a "common sense" position is one we have already "repeatedly endorsed," Maj. Op. 27, such inferences are precisely of the sort that we have consistently refused to draw on records similar to the one here. *See Jones*, 393 F.3d at 111.

The majority attempts to bolster the inference that the defendant was a trusted co-conspirator by likening this case to its distant *Huezo* relatives and suggesting that, when considering the "totality" of the other corroborating evidence, we can easily find that Hakimi was a knowing insider.  Maj. Op. 34.  This "totality," however, consists of phone calls of unknown content to one principal, phone calls of unknown content to another principal, including one on the morning of the planned drug transfer, and third-party testimony that *these* conspirators would not have trusted *their* high-value contraband with just *any* courier.  All other evidence considered amounts at most to suspicious behavior of the defendant leading up to his arrest and his presence at the foiled drug exchange.  We have time and time again unreservedly reversed conspiracy convictions considering similar evidence, notwithstanding the deference owed the jury's verdict, on the basis that the evidence, much stronger than that in the instant matter, was insufficient to support an inference of the defendant's knowledge.

Having discussed *Torres* above, *United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008), serves as an apt starting point.  In *Lorenzo*, we reversed the jury verdict because, even though a

19

transfer of purported drug proceeds occurred and the evidence showed the defendant played a key role in that transfer, the defendant's participation was "consistent with participation in a wide variety of offenses." *Id.* at 160. The government had also shown that Lorenzo's nephew was involved in drug trafficking, that Lorenzo had contact with his nephew, that Lorenzo was present to pick up the drug courier and take her to a hotel, and that, a day later, Lorenzo gave the courier a suitcase containing $14,000 to deliver to his nephew. Additionally, Lorenzo gave a false exculpatory statement about giving the money to the courier, and the courier was told to call Lorenzo during a subsequent trip. *Id.* at 161. The government argued that this "call," viewed with the other evidence, supported an inference that the principal of the conspiracy "would not have entrusted [Lorenzo] with the suitcases concealing the narcotics, worth over $250,000, unless [Lorenzo] had known what was concealed within them and that it was reasonably foreseeable to him that the smuggled narcotic . . . was cocaine." *Id.* (internal quotation marks omitted). We rejected this argument and reversed the conviction, noting that such an "unfulfilled request . . . cannot support such a speculative and attenuated inference" even when considered in light of the other evidence. *Id.*

We reached a similar result in *United States v. Ogando*, 547 F.3d 102 (2d Cir. 2008). There, we reversed a jury conviction for, *inter alia*, conspiracy to import ecstasy and conspiracy to distribute and possess with intent to distribute ecstasy. In that case, Ogando, a taxi driver, displayed suspicious behavior in meeting up with a drug courier at the airport whom he was hired to pick up. *Id.* at 108. Upon escorting the courier to his car, Ogando was arrested. *Id.* The government established at trial that Ogando was present at another airport where another co-conspirator was arrested earlier, that he made false exculpatory statements during his arrest, and that he had business cards and contact information for members of the conspiracy on him and

20

multiple numbers of principals of the conspiracy in his cell phone. All of this, however, we held as evidence that "simply show[ed] that [defendant] was a livery cab driver regularly used by members of this conspiracy." *Id.* at 108. This is because our jurisprudence holds that a defendant's suspicious behavior in attempting to take delivery of narcotics shipment does not indicate knowledge that the shipment contained drugs. *See, e.g.*, *Torres*, 604 F.3d at 70–71. Indeed, the government also presented testimony that Ogando was hired as the driver because he was a "friend" from "New York." We refused to find a basis for inferring a trusted relationship based on that testimony because "it [did] not show that Ogando knew the nature of the conspirators' business," rather it showed the conspirators' intent but not his own. *Id.* We reversed Ogando's conviction for insufficient evidence.

Again, we followed a similar course in *United States v. Friedman*, 300 F.3d 111 (2d Cir. 2002). There we reversed the jury verdict because the evidence at trial failed to demonstrate that the defendant had specific knowledge about a co-conspirator's extortion plot. *Id.* at 126. The evidence included three phone calls between the defendant and a co-conspirator, one 43 minutes in length in the days leading up to the crime, a record of calls between an associate of the defendant and other members of the conspiracy, and testimony that the defendant had a friendly relationship with the co-conspirators. *Id.* at 125. The government also showed that the co-defendant arranged for the defendant to wire money to another co-conspirator in order to purchase firearms and a car, and that, on one occasion, the defendant asked the co-defendant to meet the remaining conspiracy members with firearms and a car. *Id.* at 125–26. Nonetheless, we held that the defendant "met the heavy burden [of demonstrating . . .] that the evidence was insufficient." *Id.* at 126 (internal quotation marks omitted).

21

Yet again, in *United States v. Gaviria*, 740 F.2d 174 (2d Cir. 1984), we reversed a conviction on the basis that evidence did not demonstrate the knowing participation in a drug conspiracy and only showed that the defendant had a connection with drug traffickers. The evidence showed that the defendant and a friend went to an apartment identified by law enforcement as a "stash pad." The pair entered the building together and left in a suspicious manner and, when stopped by law enforcement, the defendant lied about her presence at the building. *Id.* at 183. A search of the apartment indicated that cocaine had been prepared in the apartment. *Id.* Law enforcement found seven grams of cocaine in a package on the floor of the defendant's vehicle and confronted the defendant with the plastic bag containing white powder to which she responded "the cocaine wasn't found on my side of the car, was it?" *Id.* Further, the government showed that Lopez knew the drug traffickers and knew that they engaged in the sale of narcotics. In reversing the defendant's conviction, we noted that "contact with drug traffickers" alone is "insufficient to prove participation in a conspiracy." Even when coupled with the exculpatory statements, the record did not substantiate the defendant's knowing participation in the conspiracy charged. *Id.* at 184. Again, we reversed for insufficiency of evidence.

Several other cases, some previously noted, hold similarly on records more substantial than the instant one. *See, e.g.*, *Torres*, 604 F.3d at 70–71 (holding that a defendant's suspicious behavior in attempting to take delivery of narcotics shipment did not indicate knowledge that the shipment contained drugs); *United States v. Rodriguez*, 392 F.3d 539, 546–48 (2d Cir. 2004) (holding that evidence demonstrating only that defendant served as a lookout for some sort of illicit transaction is insufficient that he knew it was a drug transaction specifically); *United States v. Samaria*, 239 F.3d 228, 236–38 (2d Cir. 2001) (holding that a gypsy cab driver's presence in a

22

car with conspirators, and assistance with loading non-transparent boxes containing stolen credit card information, did not demonstrate knowledge of conspiracy to commit credit card fraud). As the court below found and as the record discloses, there is absolutely no circumstantial evidence beyond the street value of the drugs and phone calls of unknown content. And the majority points to nothing further. All the jury had before it was evidence that Hakimi had multiple phone contacts with several principals of the organization and that he showed up to pick up a package that he would transport on behalf of the principals. There exists no evidence to bolster an inference that Hakimi knew that he was to be given drugs to transport. A jury ought not to be able to find from those facts alone that the defendant had specific knowledge of the contents of the package, and the jury here had no basis in the law to infer from this record that Hakimi knew specifically that the object he was to transfer was a controlled substance without our fashioning, as the majority does today, a new rule that significantly modifies our well-settled conspiracy jurisprudence. I would affirm the district court's determination under Fed R. Crim. P. 29 that the evidence presented was insufficient as a matter of law.

## II.     Attempt

The majority's reasoning with respect to the attempt conviction fails for largely the same reasons as the conspiracy conviction. In order to prevail, the government had to prove beyond a reasonable doubt that Hakimi "had the intent to commit the object crime" and "engaged in conduct amounting to a substantial step towards its commission." *United States v. Farhane*, 634 F.3d 127, 145 (2d Cir. 2011). Of course, attempt, like conspiracy, is a specific intent crime. When possession is the underlying offense, knowledge of the nature of the contraband possessed is similarly crucial. For the same reasons discussed above, the evidence presented simply does not show that Hakimi had knowledge that the contraband was drugs. Although Hakimi sat in

23

Anderson's truck in proximity to the blue bag containing the pills, there is no evidence that Hakimi touched the bag or knew what was in it. Likewise, there is no evidence that the bag was transparent, or that the bag was open, although there is some suggestion in the record that the bag was slightly open and that the agents could see some plastic. Anderson never testified that Hakimi even noticed the bag. The district court, too, noted the absence of evidence that Hakimi inquired about the bag's contents drugs and also that Hakimi never made any statements about drugs. Finally, the court observed that "the only conversation [Anderson] and the defendant had during their interaction on the dead-end road pertained to directions back to the Reservation." On this record, there is no evidence that Hakimi knew drugs were involved or that he was in the vicinity of drugs. The record provides no evidence that Hakimi knew what he was about to possess, and that shortcoming is fatal to his attempt conviction. Accordingly, I would affirm the district court's determination that the evidence was insufficient as a matter of law to sustain such a conviction.

**Conclusion**

There is no basis in this record on which the jury could rationally infer a trust relationship between Hakimi and the principals and thereby infer Hakimi's knowledge of the nature of the contraband. To that end, the majority proposes a broad holding that a jury can infer a "trusted insider" status, and thereby knowledge of the nature of the object of a conspiracy, from nothing more than the value of the contraband to be transported, phone calls of unknown content, and a co-conspirator's intention that the defendant have sole possession of the object to be delivered. This is not, in my view, in line with this Circuit's prior precedent and is tantamount to the sort of

24

speculation that we have previously held insufficient to support a conviction for drug conspiracy or attempted possession of controlled substances. I respectfully dissent.[6]

---

[6] Noting that four judges (albeit two are the controlling majority on the Court of Appeals) are evenly split on whether there was sufficient evidence to convict Hakimi, I do join in Footnote 20 of the majority opinion.